1  COAST LAW GROUP, LLP
   MARCO A. GONZALEZ (SBN 190832)
2  LIVIA B. BEAUDIN (SBN 259434)
3  1140 South Coast Highway 101
   Encinitas, CA 92024
4  Ph: (760) 942-8505
   Fx: (760) 942-8515
5  Email: marco@coastlawgroup.com
6

7  Attorneys for Plaintiff
8  COASTAL ENVIRONMENTAL RIGHTS FOUNDATION
9

10            **UNITED STATES DISTRICT COURT**
11           **SOUTHERN DISTRICT OF CALIFORNIA**

12 | COASTAL ENVIRONMENTAL RIGHTS | Civil Case No.: **'17 CV425  BAS JMA**
13 | FOUNDATION, |
   | a non-profit corporation, | **COMPLAINT FOR DECLARATORY**
14 | | **AND INJUNCTIVE RELIEF AND**
   | | **CIVIL PENALTIES**
15 |         Plaintiff, |
16 | |
   |         v. | **(Federal Water Pollution Control Act,**
17 | |  **33 U.S.C. § 1251 *et seq*.)**
18 | AMERICAN RECYCLING |
   | INTERNATIONAL, INC, a California |
19 | corporation, dba LKQ PICK YOUR PART |
   | OCEANSIDE, |
20 | |
21 |         Defendant. |
22
23
24
25
26
27
28

Coastal Environmental Rights Foundation, ("CERF" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   JURISDICTION AND VENUE

1.     This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq*. (the "Clean Water Act" or the "CWA"). This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.     On December 21, 2016, Plaintiff issued a 60-day notice letter ("Notice Letter") to American Recycling International, Inc. dba LKQ Pick Your Part Oceanside, ("LKQ" or "Defendant") regarding its violations of the Clean Water Act, and of Plaintiff's intention to file suit against Defendant. The Notice Letter was sent to the registered agent for LKQ, as required by 40 C.F.R. § 135.2(a)(1), the Facility (Airport Road), as well as the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Diego Region ("Regional Board") as required by CWA, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of the Notice Letter is attached hereto as Exhibit A and incorporated herein.

3.     More than sixty days has passed since the Notice Letter was served on Defendant and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this complaint. (33 U.S.C. § 1365(b)(1)(B)). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

4.     Venue is proper in the Southern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are

located within this judicial district.

## II.   INTRODUCTION

5.     This complaint seeks relief for the Defendant's unlawful discharge of pollutants into waters of the United States from its operations at 1030 Airport Road, Oceanside, California ("LKQ Facility" or "Site"). Specifically, Defendant discharges storm water runoff from the Site into City of Oceanside storm drains, the San Luis Rey River, and ultimately the Pacific Ocean (collectively referred to as the "Receiving Waters"). This complaint also seeks relief for Defendant's violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of California's General Permit for Discharges Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ*) ("Industrial Permit"). Defendant's violations of the Clean Water Act and the Industrial Permit are ongoing and continuous.

6.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the LKQ Facility, flow into Oceanside storm drain systems, San Luis Rey River, and ultimately the Pacific Ocean. This discharge of pollutants in storm water from industrial activities such as the LKQ Facility contributes to the impairment of downstream waters and compromises or destroys their beneficial uses.

## III.   PARTIES

### A.   Coastal Environmental Rights Foundation

7.     Plaintiff CERF is a non-profit public benefit corporation organized under the laws of the State of California.

8.     CERF's office is located at 1140 South Coast Highway 101, Encinitas California, 92024.

9.     CERF was founded by surfers in North San Diego County and active

throughout California's coastal communities. CERF was established to aggressively advocate, including through litigation, for the protection and enhancement of coastal natural resources and the quality of life for coastal residents. One of CERF's primary areas of advocacy is water quality protection and enhancement.

10.     Plaintiff has thousands of members who live and/or recreate in and around the San Luis Rey River and the Pacific Ocean.

11.     Plaintiff's members use and enjoy the Receiving Waters to fish, sail, boat, kayak, paddle board, surf, swim, hike, view wildlife, and engage in scientific study including monitoring activities, among other activities. Defendant discharges pollutants from the Site to the Receiving Waters used by Plaintiff's members. Thus, Defendant's discharge of pollutants impairs Plaintiff's members' uses and enjoyment of the Receiving Waters.

12.     The interests of Plaintiff's members have been, are being, and will continue to be adversely affected by the Defendant's failure to comply with the Clean Water Act and the Industrial Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff's members, for which harm they have no plain, speedy or adequate remedy at law.

**B.     The LKQ Facility Owners and/or Operators**

13.     Plaintiff is informed and believes that LKQ is a corporation organized under the laws of the State of California, and is located in Oceanside, California.

14.     Plaintiff is informed and believes that LKQ has owned and operated the LKQ Facility located at 1030 Airport Road, Oceanside, California, since at least July 24, 2015.

**IV.   STATUTORY BACKGROUND**

**A.     The Clean Water Act**

15.     Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies

with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

16.    Section 402(p) of the CWA establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. (33 U.S.C. § 1342(p)). States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. (33 U.S.C. § 1342).

17.    Section 402(b) of the CWA allows each state to administer its own EPA-approved permit for storm water discharges. (33 U.S.C. § 1342(b)). In California, the State Board is charged with regulating pollutants to protect California's water resources.

18.    Section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants.  See 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

19.    The Industrial Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA that regulates the discharge of pollutants from industrial sites. (33 U.S.C. § 1342).

20.    Section 505(a)(1) of the CWA provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation… or an order issued by the Administrator or a State with respect to such a standard or limitation." (33 U.S.C. § 1365(a)(1)). LKQ is a "person" within the meaning of section 502(5) of the Clean Water Act. 33 U.S.C. § 1362(5).

21.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

22.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015 and up to $37,500 per day per violation for all violations occurring after January 27, 2009 and up to November 2, 2015. (33 U.S.C. § 1319(d); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §19.4).

23.     Section 505(d) of the Clean Water Act permits prevailing parties to recover costs, including attorneys' and experts' fees. (33 U.S.C. § 1365(d)).

### B.     California's Industrial Permit

24.     The Industrial Permit, NPDES General Permit No. CAS000001, Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ and Order No. 2014-0057-DWQ is an NPDES permit adopted pursuant to Section 402 of the CWA, 33 U.S.C. § 1342(b) and 40 C.F.R § 123.25.  In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Industrial Permit and comply with its terms, or obtain and comply with an individual NPDES permit. The Industrial Permit as amended pursuant to Order No. 2014-0057-DWQ became effective July 1, 2015 ("New Industrial Permit").

25.     Failure to comply with the Industrial Permit or New Industrial Permit constitutes a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A.).

26.     Discharge Prohibitions A(1) of the Industrial Permit and III.B. of the New Industrial Permit prohibit the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States. Discharge Prohibition A(2) of the Industrial Permit and III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

27.     Effluent limitations B(3) of the Industrial Permit and Sections I.D and V.A. of the New Industrial Permit require facility operators to reduce or prevent

pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

28.     Effluent limitations B(1) of the Industrial Permit and Sections I.K and V.B. of the New Industrial Permit require facility operators of facilities in specific industrial categories to comply with Effluent Limitations Guidelines at 40 C.F.R. Chapter 1 Subchapter N.

29.     Industrial Permit Receiving Water Limitation C(1) and New Industrial Permit Receiving Water Limitation VI.B. prohibit storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impacts human health or the environment.

30.     Industrial Permit Receiving Water Limitation C(2) and New Industrial Permit Receiving Water Limitation VI.A. prohibit storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of an applicable water quality standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

31.     Section A(1) and Provision E(2) of the Industrial Permit require dischargers to have developed and implemented a Storm Water Pollution Prevention Plan ("SWPPP") by October 1, 1992, or prior to beginning industrial activities, that meets all the requirements of the Industrial Permit. Sections X.A. and B. of the New Industrial Permit require development and implementation of site-specific SWPPPs by July 1, 2015 or upon commencement of industrial activity.

32.     The objective of the SWPPP is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges from the Sites, and identify and implement site-specific Best Management Practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges. (Industrial Permit, Section A(2); New Industrial Permit,

7

Section X.C.1).

33.     To ensure its effectiveness, the SWPPP must be evaluated on an annual basis, and it must be revised as necessary to ensure compliance with the Permit. (Industrial Permit, Sections A(9), (10); New Industrial Permit, Sections XA. And X.B.1.).

34.     Sections A(3) through A(10) of the Industrial Permit and Sections X.A to X.I. of the New Industrial Permit set forth the requirements for a SWPPP.

35.     The SWPPP must include a site map showing the facility boundaries, storm water drainage areas with flow patterns, nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, areas of actual and potential pollutant contact, and areas of industrial activity. (Industrial Permit, Section A(4); New Industrial Permit, Section X.E.).

36.      Dischargers are also required to prepare and implement a monitoring and reporting program ("M&RP"). (Industrial Permit, Sections E(3), B(1); New Industrial Permit, Section XI).

37.     The objective of the M&RP is to ensure that BMPs have been adequately developed and implemented, revised as necessary, and to ensure that storm water discharges are in compliance with the Industrial Permit (up to July 1, 2015) and New Industrial Permit (July 1, 2015 and thereafter) Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. (Industrial Permit, Section B(2); New Industrial Permit, Finding J.56).

38.     The Industrial Permit and New Industrial Permit require dischargers to conduct visual observations for the presence of unauthorized non-storm water discharges, to document the source of any discharge, and to report the presence of any discolorations, stains, odors, and floating materials in the discharge.

39.     The Industrial Permit and New Industrial Permit require dischargers to visually observe drainage areas during the wet season (October 1 - May 30) and to document the presence of any floating and suspended materials, oil and grease,

discolorations, turbidity, or odor in the discharge, and the source of any pollutants.

40.     Both the Industrial Permit and New Industrial Permit require dischargers to maintain records of observations, observation dates, locations observed, and responses taken to eliminate unauthorized non-storm water discharges and to reduce or prevent pollutants from contacting non-storm water and storm water discharges.

41.     The Industrial Permit requires dischargers to collect a sample from all discharge points during the first storm event of the wet season and during at least one other storm event of the wet season, for a total of two samples per wet season. (Industrial Permit, Section (B)(5)). The New Industrial permit requires dischargers to collect and analyze storm water samples from two storm events with the first half of each reporting year (July 1 to December 31) and two from the second half (January 1 to June 30). (New Industrial Permit, Section XI.B.2.).

42.     Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

43.     Dischargers must submit "Annual Reports" to the Regional Board in July of each year. (Industrial Permit, Section B(14); New Industrial Permit, Section XVI.A.).

## V.     STATEMENT OF FACTS

### A.     LKQ Facility

44.     Plaintiff is informed, believes and thereon alleges the LKQ Facility is approximately 14 acres and belongs to Sector M of the Industrial Permit and its standard industrial classifications (SIC) code is 5015, establishments primarily engaged in dismantling used motor vehicles for the purpose of selling parts.

45.     Plaintiff is informed, believes, and thereon alleges the LKQ Facility primarily conducts junk vehicle storage, vehicle loading and unloading, battery removal, dismantling, cutting and baling, and vehicle maintenance, fueling and washing activities onsite.

46.     Plaintiff is informed, believes, and thereon alleges the LKQ Facility also conducts fluid draining (engine oil, coolants, etc) onsite.

47.     Plaintiff is informed, believes, and thereon alleges various industrial materials comprised of new and used engine oil, anti-freeze, fuel, batteries, mercury switches, detergents, grease, and solvents are utilized and stored onsite.

48.     Plaintiff is informed, believes, and thereon alleges particulates from operations, oil, grease, suspended solids, hazardous waste, phosphorous, and metals such as aluminum, iron, copper, lead and zinc materials are exposed to storm water at the LKQ Facility.

49.     Plaintiff is informed, believes, and thereon alleges that storm water is discharged from one discharge point at the Facility into the City of Oceanside's stormwater conveyance systems or directly to the San Luis Rey River.

50.     Plaintiff is informed, believes, and thereon alleges the LKQ Facility discharges into storm water conveyance systems that discharge into the San Luis Rey River and ultimately the Pacific Ocean.

51.     The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. (*See* 40 C.F.R. § 122.2). The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. (40 C.F.R. § 122.21).

52.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. (*See Rapanos v. United States,* 547 U.S. 715 (2006)).  A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the

chemical, physical, and biological integrity of other covered waters." (*Id.* at 780).

53.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. (*Id.* at 783).

54.     Information available to Plaintiff indicates that each of the surface waters into which the LKQ Facility discharges polluted storm water are traditional navigable waters, or tributaries to such waters, such as the San Luis Rey River and the Pacific Ocean.

55.      Plaintiff is informed, believes, and thereon alleges the LKQ Facility's polluted discharges cause, threaten to cause, and/or contribute to the impairment of water quality in the San Luis Rey River.  Elevated levels of bacteria, chloride, phosphorus, total dissolved solids, nitrogen and toxicity have resulted in the inability of the River to support its beneficial uses.

56.     Water Quality Standards are pollutant concentration levels determined by the State Board and the EPA to be protective of the beneficial uses of the receiving waters.  Discharges above Water Quality Standards contribute to the impairment of the receiving waters' beneficial uses.

57.     The applicable Water Quality Standards include, but are not limited to, those set out by the State of California in the Criteria for Priority Toxic Pollutants, 40 C.F.R. § 131.38 , ("California Toxics Rule" or "CTR") and in the Basin Plan. The CTR limits are, in part, as follows: lead – .065 milligrams per liter (mg/L); copper – .013 mg/L; zinc – .12 mg/L. These numeric criteria are set to protect human health and the environment in the State of California. The CTR limits represented are the maximum concentration levels permissible to achieve health and environmental protection goals.

58.     EPA Benchmarks are the pollutant concentrations above which EPA has determined are indicative of a facility not successfully developing or implementing BMPs that meet BAT for toxic pollutants and BCT for conventional pollutants. (See Multi-Sector General Permits for Stormwater Discharges Associated with Industrial

Activity (MSGP), 2015, §§6.2.1, 8.M, Table 8.M-1). The benchmark values provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. (MSGP Fact Sheet, p. 52). Failure to conduct and document corrective action and revision of control measures in response to benchmark exceedances constitutes a permit violation. (*Id.*, at p. 65).

59.     EPA has established the following sector-specific benchmark values for Sector M, Automobile Salvage Yards (SIC 5015): aluminum: 0.75 mg/L; total suspended solids (TSS): 100 mg/L; iron: 1.0 mg/L; lead: .014-.262 mg/L[1]. (MSGP, §8.M, Table 8.M-1).

60.     The Regional Board's Basin Plan establishes water quality objectives, implementation plans for point and nonpoint source discharges, and prohibitions, and furthers statewide plans and policies intended to preserve and enhance the beneficial uses of all waters in the San Diego region. (*See* Basin Plan at p. 1-1). The Basin Plan identifies several beneficial uses for regional waters, including for the San Luis Rey River. The Basin Plan establishes the following water quality objectives for the San Luis Rey Hydrologic Unit, including the San Luis Rey River: iron: 0.3 mg/L; pH – not less than 6.5 and not greater than 8.5. (See Basin Plan at Table 3-2; p. 3-13; p. 3-25)

**B.     Past and Present Industrial Activity at the LKQ Facility**

61.     Plaintiff is informed, believes, and thereon alleges that, in its Notice of Intent to Obtain Coverage under Industrial Permit submitted to the Regional Board, Defendant lists its primary Standard Industrial Classification ("SIC") code as 5015 for facilities primarily engaged in wholesale or retail distribution of used motor vehicle parts.

62.     Plaintiff is informed, believes, and thereon alleges that Defendant engages in dismantling of used motor vehicle parts.

63.     Plaintiff is informed, believes, and thereon alleges that Defendant engages

---

[1] The benchmark for lead is dependent on water hardness.

in metal cutting, fluid drainage, torching, bailing, and vehicle fueling, washing and maintenance.

64.     The potential pollutant sources associated with the industrial activities at the LKQ Facility include, but are not limited to: the scrap metal outdoor storage areas; oil and lubricant storage; battery storage areas; equipment and container storage areas; loading and unloading areas; maintenance areas; hazardous waste storage areas; and the on-site material handling equipment such as forklifts.

65.     Plaintiff is informed, believes, and thereon alleges that pollutants present in storm water discharged from the LKQ Facility therefore include but are not limited to: toxic metals such as iron, zinc, lead, copper and aluminum; petroleum products including oil, fuel, grease, transmission fluids, brake fluids, hydraulic oil and diesel fuel; acids and solvents; lubricants; caustics; nitrogen; phosphorous; dissolved solids; total suspended solids and pH-affecting substances; hazardous waste; bacteria; and fugitive and other dust, dirt and debris.

66.     Based upon Plaintiff's investigation, Plaintiff is informed, believes, and thereon alleges Defendant stores used vehicles, vehicle parts, metal, hazardous waste, and other materials outside where it is exposed to storm water.

67.      Plaintiff is informed, believes, and thereon alleges that there are containers stored on-Site that are uncovered and/or uncontained.

68.     Plaintiff is informed, believes, and thereon alleges that at least one discharge point at the LKQ Facility conveys storm water pollution off the site and into area storm water conveyance systems.

69.     Plaintiff is informed, believes, and thereon alleges that the LKQ Facility lacks effective BMPs to control the flow of storm water from the Facility into storm water conveyance systems or directly into the San Luis Rey River.

70.     Suspended solids, metal particles, and other pollutants have been and continue to be conveyed from the LKQ Facility into storm drain conveyance systems.

71.     Plaintiff is informed, believes, and thereon alleges that during rain events

at the LKQ Facility, storm water carries pollutants from the outdoor fabrication and storage areas, bins and dumpsters; outdoor equipment and vehicles; maintenance areas; floor contaminants, equipment, and other sources directly into the storm drain conveyance systems or directly into San Luis Rey River.

72.     Plaintiff is informed, believes, and thereon alleges that the LKQ Facility pollution control measures are ineffective in controlling the exposure of pollutant sources to storm water at the LKQ Facility.

### C.   The LKQ Facility and its Associated Discharge of Pollutants

73.     Plaintiff is informed, believes, and thereon alleges that with every significant rain event, the LKQ Facility discharges polluted storm water from the industrial activities at the facility via the City of Oceanside's storm drain system and into the Receiving Waters, or directly to the San Luis Rey River.

74.     Plaintiff is informed, believes, and thereon alleges that the Receiving Waters into which the LKQ Facility discharges polluted storm water are waters of the United States and therefore the Industrial Permit properly regulates discharges to those waters.

75.     Surface waters that cannot support their Beneficial Uses listed in the Basin Plan are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. According to the 2012 303(d) List of Impaired Water Bodies, the San Luis Rey River is impaired for bacteria, chloride, phosphorus, total dissolved solids, toxicity and nitrogen.

76.     Because discharges from the LKQ Facility contain particulates, metals, and nitrogen, the LKQ Facility's polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters.

77.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the LKQ Facility has exceeded the CTR Water Quality Standards applicable to zinc in California. For example, Defendant's 2015-2016 monitoring data indicates levels of zinc as high as 1.03 mg/L which is over 8 times the CTR limit of 0.12

Complaint for Declaratory and Injunctive Relief and Civil Penalties

mg/L and the EPA Benchmark value of 0.12 mg/L.[2] (MSGP, §8.M, Table 8.M-1; Fact Sheet, p. 56).

78.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the LKQ Facility has exceeded the CTR Water Quality Standards applicable to copper in California. For example, Defendant's 2015-2016 monitoring data indicates levels of copper as high as 0.231 mg/L which is almost 18 times the CTR limit of 0.013 mg/L.

79.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the LKQ Facility has also exceeded the EPA Benchmark value for aluminum. For example, Defendant's 2015-2016 monitoring data indicates exceedance levels of aluminum at 8.17 mg/L, which almost 11 times the EPA Benchmark value for aluminum of 0.75 mg/L. (MSGP, §8.M, Table 8.M-1).

80.     Plaintiff is informed, believes, and thereon alleges that the storm water discharged from the LKQ Facility has exceeded the EPA Benchmark value for iron. For example, Defendant's 2015-2016 monitoring data indicates exceedance levels of iron at 13.3 mg/L, which is 13 times the EPA benchmark value for iron of 1.0 mg/L and 44 times the applicable Basin Plan objective of .3 mg/L. (MSGP, §8.M, Table 8.M-1, Fact Sheet, p. 55).

81.     Plaintiff is informed, believes, and thereon alleges that LKQ's more recent monitoring data reveals similar exceedances.

82.     Plaintiff is informed, believes, and thereon alleges that during every significant rain event that has occurred at the LKQ Facility since July 24, 2015 through the present, Defendant has discharged and continues to discharge storm water from the LKQ Facility that contains pollutants at levels in violation of the prohibitions and limitations set forth in the Industrial Permit and other applicable Water Quality Standards.

---

[2] This benchmark value is hardness-dependent. Assuming the 100 mg/L water hardness range applies, the benchmark is .12 mg/L.

83.     Plaintiff is informed, believes, and thereon alleges, from visual observations, sample results, and investigations available to Plaintiff, the Defendant has failed and continues to fail to develop and/or implement adequate BMPs to prevent the discharge of polluted storm water from the LKQ Facility.

84.     The inadequacy of the BMPs at the LKQ Facility is a result of the Defendant's failure to develop and implement an adequate SWPPP and companion M&RP for this Site.

85.     Storm water discharges from the LKQ Facility contain pollutant concentration levels that are above both EPA Benchmarks and applicable Water Quality Standards.

86.     Plaintiff is informed, believes, and thereon alleges that since at July 24, 2015 through the present, Defendant has failed to develop and implement BMPs that meet the standards of BAT/BCT at the LKQ Facility in violation of Effluent Limitation B(3) of the Industrial Permit and Effluent Limitation I.D. and V.A. of the New Industrial Permit.

87.     Each day that Defendant has failed and continues to fail to implement adequate BMPs to achieve BAT/BCT constitutes a separate violation of the Industrial Permit and the CWA.

88.     Based on its investigation of the LKQ Facility, Plaintiff is informed and believes that Defendant has failed to develop and implement an adequate SWPPP since at least July 24, 2015 through the present.

89.     Each day that Defendant has failed and continues to fail to implement an adequate SWPPP constitutes a separate violation of the Industrial Permit and the CWA.

90.     Plaintiff is informed, believes, and thereon alleges that Defendant has failed to submit written reports to the Regional Board identifying additional BMPs necessary to achieve BAT/BCT at the LKQ Facility since at least July 24, 2015, in violation of Receiving Water Limitations C(3) and C(4) of the Industrial Permit and New Industrial Permit Receiving Water Limitations VI.A.-C.

91.    Each day that Defendant has operated the LKQ Facility without meeting this reporting requirement of the Industrial Permit constitutes a separate violation of the Industrial Permit and the CWA.

**D.    Defendant's Monitoring Program**

92.    From July 24, 2015 through the present, the LKQ Facility was required to sample at least two storm events within the first half of each reporting year (July 1 to December 31) and two storm events within the second half of each reporting year (January 1 to June 30) in accordance with the sampling and analysis procedures in New Industrial Permit Section XI.B.

93.    Dischargers must analyze each sample for pH, total suspended solids, oil and grease, and for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility. (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

94.    The LKQ Facility is required to sample for iron, aluminum, and lead as sector-specific parameters.  (Industrial Permit, Section B(5)(c); New Industrial Permit, Section XI.B.6).

95.    Because of the presence of zinc and copper in LKQ's discharge, it is also required to sample for zinc and copper. (New Industrial Permit, §XI.B.6.c.).

96.    Though San Luis Rey River is impaired for phosphorous, and the EPA lists phosphorous as a likely pollutant associated with Sector M facilities, LKQ does not monitor its discharge for phosphorous.

97.    All monitoring data must be uploaded to SMARTS within 30 days of obtaining all results for each sampling event. (New Industrial Permit, XI.B.11.a)

98.    Plaintiff is informed, believes, and thereon alleges that despite the extremely high levels of pollutants reported in the samples that were taken at the LKQ Facility, the Defendant has not sampled and submitted sampling reports as required.

99.    Plaintiff is informed, believes, and thereon alleges that Defendant has not successfully sampled and reported during the 2015-2016 reporting year by failing to

take a minimum of four samples.

100.    Plaintiff is informed, believes, and thereon alleges that Defendant has not successfully sampled and reported during the 2016-2017 reporting year by failing to take a minimum of two samples during the second half of 2016.

101.    Information available to Plaintiff indicates that Defendant has not conducted any assessments or submitted any reports pursuant to Section XX.B of the New Industrial Permit.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Storm Water in
Violation of the Industrial Permit's Discharge Prohibitions and
Receiving Water Limitations and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

102.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

103.    Plaintiff is informed, believes, and thereon alleges that as a result of the operations at the LKQ Facility, during every significant rain event, storm water containing pollutants harmful to fish, plant, bird life, and human health is discharged from the LKQ Facility to the Receiving Waters.

104.    Plaintiff is informed, believes, and thereon alleges that Defendant's discharges of contaminated storm water have caused, continue to cause, and threaten to cause pollution, contamination, and/or nuisance to the waters of the United States in violation of Sections III.C. and VI.C of the New Industrial Permit.

105.    Plaintiff is informed, believes, and thereon alleges that these discharges of contaminated storm water have, and continue to, adversely affect human health and the environment in violation of Section VI.B. of the New Industrial Permit.

106.    Plaintiff is informed, believes, and thereon alleges that these discharges of contaminated storm water have caused or contributed to and continue to cause or contribute to an exceedance of Water Quality Standards in violation of Discharge Prohibition III.D. and Receiving Water Limitation VI.A. of the New Industrial Permit.

107.   Plaintiff is informed, believes, and thereon alleges that from at least July 24, 2015 through the present, Defendant has discharged, and continues to discharge, contaminated storm water from the LKQ Facility to Receiving Waters in violation of the prohibitions of the New Industrial Permit.  Defendant is liable for civil penalties for at least 20 violations of the New Industrial Permit and the CWA.

108.   Plaintiff is informed, believes, and thereon alleges that Defendant's violations of the New Industrial Permit and the CWA are ongoing.

109.   Defendant will continue to be in violation of the New Industrial Permit requirements each day the LKQ Facility discharges contaminated storm water in violation of Industrial Permit prohibitions.

110.   Every day that Defendant has discharged and/or continues to discharge polluted storm water from the LKQ Facility in violation of the New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

111.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 24, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

112.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

/././
/././

## SECOND CAUSE OF ACTION
**Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology in Violation of the Industrial Permit and the Clean Water Act (Violations of 33 U.S.C. §§1311, 1342)**

19

113.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

114.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement BMPs that achieve compliance with BAT/BCT requirements of the Industrial Permit and the CWA.

115.    Sampling of the LKQ Facility's storm water discharges as well as Plaintiff's observations of the LKQ Facility demonstrate that Defendant has not developed and has not implemented BMPs that meet the standards of BAT/BCT. Thus, Defendant is in violation of Effluent Limitations of the New Industrial Permit.

116.    Plaintiff is informed, believes, and thereon alleges that Defendant has been in daily and continuous violation of the BAT/BCT requirements of the New Industrial Permit and the CWA every day since at least July 24, 2015.

117.    Plaintiff is informed, believes, and thereon alleges that Defendant's violations of the Effluent Limitations and the CWA are ongoing.

118.    Defendant will continue to be in violation every day the LKQ Facility operates without adequately developing and/or implementing BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the LKQ Facility.

119.    Every day that Defendant operates the LKQ Facility without adequately developing and/or implementing BMPs that achieve BAT/BCT in violation of the New Industrial Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

120.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 24, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

121.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would

irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Failure to Develop and/or Implement an Adequate
Storm Water Pollution Prevention Plan
in Violation of the Industrial Permit and Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

122.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

123.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate SWPPP for the LKQ Facility that meets the requirements set out Section X of the New Industrial Permit.

124.    Defendant has been in violation of the SWPPP requirements every day since at least June 12, 2015.

125.    Defendant's violations of the New Industrial Permit and the CWA are ongoing.

126.    Defendant will continue to be in violation of the SWPPP requirements every day the LKQ Facility operates with an inadequately developed and/or implemented SWPPP for the LKQ Facility.

127.    Each day that Defendant operates the LKQ Facility without developing and/or implementing an adequate SWPPP is a separate and distinct violation of the New Industrial Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

128.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 12, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

129.    An action for injunctive relief under the CWA is authorized by 33 U.S.C.

§ 1365(a).  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

### FOURTH CAUSE OF ACTION
**Failure to Implement an
Adequate Monitoring and Reporting Program
In Violation of the Industrial Permit and the Clean Water Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

130.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

131.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed to develop and/or implement an adequate M&RP for the LKQ Facility as required by Section X.I of the New Industrial Permit.

132.    Plaintiff is informed, believes, and thereon alleges that conditions at the LKQ Facility, as determined via sampling of storm water discharges from the LKQ Facility, and the annual reports submitted by Defendant all demonstrate that the LKQ Facility has not implemented an adequate M&RP that meets the requirements of the New Industrial Permit.

133.    Plaintiff is informed, believes, and thereon alleges that Defendant's M&RP fails to include sampling of all required constituents during all storm events in violation of Sections X.I. and XI.B of the New Industrial Permit.

134.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed and continues to fail to identify inadequacies in its SWPPP and BMPs.

135.    Defendant's violations of the New Industrial Permit and the CWA are ongoing.

136.    Defendant will continue to be in violation of the New Industrial Permit and the CWA each day the LKQ Facility operates with an inadequately implemented M&RP.

137.    Each day Defendant operates the LKQ Facility without implementing an

adequate M&RP for the LKQ Facility is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. §1311(a).

138.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 12, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

139.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## FIFTH CAUSE OF ACTION
### Failure to Conduct Required Rain Event Sampling in Violation of the Industrial Permit

140.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

141.    Plaintiff is informed, believes, and thereon alleges that Defendant is in violation of New Industrial Permit, §XI.B. by failing to sample four rain events during the 2015-2016 reporting year and two rain events in the last half of 2016.

142.    Plaintiff is informed, believes, and thereon alleges that Defendant has failed and continues to fail to collect sample all required constituents during all storm events in violation of Section XI.B of the New Industrial Permit.

143.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 24, 2015 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

144.    An action for injunctive relief under the CWA is authorized by 33 U.S.C.

§1365(a).  Continuing commission of the omissions alleged above would irreparably harm the Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## SIXTH CAUSE OF ACTION
### Failure to Submit Accurate Reports in
### Violation of the Industrial Permit and Clean Water Act

145.  Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

146.  Plaintiff is informed, believes, and thereon alleges that Defendant is in violation of New Industrial Permit Section XI.B.11.a for failing to sample and report the required four storm events and report within 30 days to SMARTS.

147.   Plaintiff is informed, believes, and thereon alleges that Defendant failed to submit a written report identifying what additional BMPs will be implemented to achieve Water Quality Standards even though Defendant discharge exceeded receiving Water Quality Standards, in violation of Receiving Water Limitations VI.A-C. of the New Industrial Permit.

148.  Plaintiff is informed, believe, and thereon alleges that Defendant submitted an Annual Report for the 2015-2016 reporting period that contains false information.

149.  Plaintiff is informed, believe, and thereon alleges that Defendant's 2015-2016 Annual Report falsely states that Defendant failed to monitor as required because it was unaware of the New Industrial Permit monitoring requirements.

150.  Defendant has been in violation each day the LKQ Facility operates without reporting as required by the New Industrial Permit.

151.  Defendant's violations of the New Industrial Permit and the CWA are ongoing.

152.  Every day Defendant operates the LKQ Facility without reporting as required by the Industrial Permit is a separate and distinct violation of the New Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

153.  Defendant has been in daily and continuous violation of the New Industrial

Permit's reporting requirements every day since at least July 24, 2015.

154.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 24, 2015 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

155.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## SEVENTH CAUSE OF ACTION
### Failure to Comply with Level 1 Exceedance Response Action Requirements in Violation of the Industrial Permit

156.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

157.    Defendant prepared a Level 1 Exceedance Response Action (ERA) Plan on December 7, 2016.

158.    In its Level 1 ERA Plan, Defendant fails to note or include an evaluation of the Facility's exceedances of copper and zinc numeric action levels, in violation of New Industrial Permit Sections XII.A-C.

159.    Defendant fails to adequately evaluate BMPs and SWPPP revisions necessary to prevent future numeric action level exceedances for all Level 1 parameters, including zinc and copper.

160.    Defendant's Level 1 ERA Plan fails to identify BMPs adequate to address and prevent future numeric action level exceedances.

161.    Every day Defendant operates the LKQ Facility without a valid Level 1 numeric action level exceedance evaluation and report as required by the New Industrial Permit is a separate and distinct violation of the New Industrial Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

162.    Defendant has been in daily and continuous violation of the New Industrial Permit's ERA requirements every day since at least October 1, 2016.

163.    By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from October 1, 2016 to the present pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365, and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. §12.4.

164.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

Wherefore, Plaintiff prays judgment against Defendant as set forth hereafter.

## VII.    RELIEF REQUESTED

165.    Wherefore, Plaintiff respectfully request that this Court grant the following relief:

a.    An order declaring Defendant to have violated and to be in violation of Section 301(a) of the CWA 33 U.S.C. § 1311(a) for its unlawful discharges of pollutants from the LKQ Facility in violation of the substantive and procedural requirements of the New Industrial Permit;

b.    An order enjoining the Defendant from violating the substantive and procedural requirements of the New Industrial Permit;

c.    An order assessing civil monetary penalties of $37,500 per day per violation for each violation of the CWA at the LKQ Facility occurring through November 1, 2015, and $51,570 per violation occurring on or after November 2, 2015, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

d.    An order requiring Defendant to take appropriate actions to restore the quality of waters impaired by its activities;

e.      An order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d);

f.      Any other relief as this Court may deem appropriate.

Dated: March 1, 2017

Respectfully submitted,

COAST LAW GROUP LLP

By: s/Livia B. Beaudin
LIVIA B. BEAUDIN
Attorneys for Plaintiff
COASTAL ENVIRONMENTAL
RIGHTS FOUNDATION
E-mail: livia@coastlawgroup.com

Complaint for Declaratory and Injunctive Relief and Civil Penalties

# EXHIBIT A

60 Day Notice Letter



1140 S. Coast Highway 101
Encinitas, CA 92024

Tel  760-942-8505
Fax 760-942-8515
www.coastlawgroup.com

**December 21, 2016**

William Blasini                    <u>VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED</u>
American Recycling International Inc
dba LKQ Pick Your Part
1030 Airport Rd
Oceanside CA 92058

Corporate Creations Network Inc
1430 Truxton Ave 5th FL
Bakersfield CA 93301

American Recycling International Inc
dba LKQ Pick Your Part
2931 E. White Star Ave
Anaheim CA 92806

Re:   <u>Clean Water Act Notice of Intent to Sue/60-Day Notice Letter</u>
        Pick Your Part Violations of General Industrial Permit

Dear Mr. Blasini:

Please accept this letter on behalf of the Coastal Environmental Rights Foundation (CERF) regarding American Recycling International Inc dba LKQ Pick Your Part Oceanside ("Pick Your Park Owners and/or Operators") violations of the State Water Resources Control Board Water Quality Order Nos. 97-03-DWQ and 2014-0057-DWQ, Natural Pollutant Discharge Elimination System (NPDES), General Permit No. CAS000001, and Waste Discharge Requirements for Discharges of Storm Water Associated With Industrial Activities Excluding Construction Activities (Industrial Permit).[1] This letter constitutes CERF's notice of intent to sue for violations of the Clean Water Act and Industrial Permit for Pick Your Part (formerly Ecology Auto Parts), located at 1030 Airport Road, Oceanside CA 92058 ("Facility" or "Pick Your Part"), as set forth in more detail below.

Section 505(b) of the Clean Water Act requires that sixty (60) days prior to the initiation of a citizen's civil lawsuit in Federal District Court under Section 505(a) of the Act, a citizen must give notice of the violations and the intent to sue to the violator, the Administrator of the U.S. Environmental Protection Agency, the Regional Administrator of the U.S. Environmental Protection Agency for the region in which the violations have occurred, the U.S. Attorney General, and the Chief Administrative Officer for the State in which the violations have occurred (33 U.S.C. § 1365(b)(1)(A)). This letter provides notice of Pick Your Part's Clean Water Act violations and CERF's intent to sue.

---

[1] The Industrial Permit amendments, pursuant to Order No. 2014-0057-DWQ, become effective July 1, 2015. All references are to the Industrial Permit prior to modification pursuant to Order No. 2014-0057-DWQ are to the "Industrial Permit." All references to the Permit as modified by Order No. 2014-0057-DWQ are to the "New Industrial Permit."

Exhibit A Page 1 of 10

## I.    Coastal Environmental Rights Foundation (CERF)

CERF is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, CA. CERF is dedicated to the preservation, protection, and defense of the environment, the wildlife, and the natural resources of the California Coast. Members of CERF use and enjoy the waters into which pollutants from Pick Your Part's ongoing illegal activities are discharged into the San Luis Rey River, downstream to the Pacific Ocean.

The public and members of CERF use San Luis Rey River and the Pacific Ocean to fish, sail, boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies. The discharge of pollutants by the Pick Your Part Facility affects and impairs each of these uses. Thus, the interests of CERF's members have been, are being, and will continue to be adversely affected by Pick Your Part Owners and/or Operators' failure to comply with the Clean Water Act and the Industrial Permit.

## II.    Storm Water Pollution and the Industrial Permit

### A.    Duty to Comply

Under the Clean Water Act, the discharge of any pollutant to a water of the United States is unlawful except in compliance with certain provisions of the Clean Water Act. (See 33 U.S.C. § 1311 (a)). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the Industrial Permit in order to lawfully discharge. Pick Your Part enrolled as a discharger subject to the New Industrial Permit on August 4, 2015 with WDID No. 9 37I025966. Ecology Auto Parts, Pick Your Part's predecessor, was enrolled under the Industrial Permit prior to 2013.

Pursuant to the Industrial Permit, a facility operator must comply with all conditions of the Industrial Permit. Failure to comply with the Industrial Permit is a Clean Water Act violation. (Industrial Permit, § C.1; New Industrial Permit §XXI.A. ["Permit noncompliance constitutes a violation of the Clean Water Act and the Water Code..."]). Any non-compliance further exposes an owner/operator to an (a) enforcement action; (b) Industrial Permit termination, revocation and re-issuance, or modification; or (c) denial of a Industrial Permit renewal application. (*Id.*).  As an enrollee, Pick Your Part has a duty to comply with the Industrial Permit and is subject to all of the provisions therein.

### B.    The Pick Your Part Facility Discharges Contaminated Storm Water in Violation of the Industrial Permit

Discharge Prohibition A(2) of the Industrial Permit and Section III.C. of the New Industrial Permit prohibit storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges to surface or groundwater that adversely impact human health or the environment. In addition, receiving Water Limitation C(2) prohibits storm water discharges and authorized non-storm water discharges, which cause or contribute to an exceedance of any water quality standards, such as the CTR or applicable Basin Plan water quality standards. (See New Industrial Permit, §III.D.;

§VI.A.). "The California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard." (*Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 926). "In sum, the CTR is a water quality standard in the General Permit, Receiving Water Limitation C(2). A permittee violates Receiving Water Limitation C(2) when it 'causes or contributes to an exceedance of' such a standard, including the CTR." (*Id.* at 927).

If a discharger violates Water Quality Standards, the Industrial Permit and the Clean Water Act require that the discharger implement more stringent controls necessary to meet such Water Quality Standards.(Industrial Permit, Fact Sheet p. viii; New Industrial Permit, §XX.B.1; 33 U.S.C. § 1311(b)(I)(C)). The Pick Your Part Owners and/or Operators have failed to comply with this requirement, routinely violating Water Quality Standards without implementing BMPs to achieve BAT/BCT or revising the Pick Your Part SWPPP pursuant to section New Industrial Permit Section XX.B.

The monitoring data for the Pick Your Part Facility indicates consistent, ongoing exceedances and violations of the Industrial Permit. The Pick Your Part Owners and/or Operators have discharged and continue to discharge storm water containing pollutants at levels in violation of the above listed prohibitions and limitations during every significant rain event. Pick Your Part's sampling data reflects 7 discharge violations. Pick Your Part's own sampling data is not subject to impeachment. (*Baykeeper, supra*, 619 F.Supp. 2d at 927, citing *Sierra Club v. Union Oil Co. of Cal.*, (9th Cir. 1987) 813 F.2d 1480, 1492 ["when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error"]).

As reflected below, during the only rain event sampled, the Facility has exceeded the CTR and benchmarks. The iron concentration is over **443 times** the Basin Plan objective for iron and the exceedance for zinc is over **8.5 times** the CTR limit.

| No. | Date | Parameter | Units | Result | Benchmark/WQO | NAL |
|-----|------|-----------|-------|--------|---------------|-----|
| 1 | 5/6/2016 | Oil & Grease | mg/L | 18.2 | - | 15 |
| 2 | 5/6/2016 | TSS | mg/L | 385 | - | 100 |
| 3 | 5/6/2016 | Iron | mg/L | 13.3 | 0.3[1] | 1.0 |
| 4 | 5/6/2016 | Zinc | mg/L | 1.03 | .12[2] | .26 |
| 5 | 5/6/2016 | Copper | mg/L | .231 | .013[2] | .0332 |
| 6 | 5/6/2016 | Aluminum | mg/L | 8.17 | .75[3] | .75 |
| 7 | 5/6/2016 | Lead | mg/L | .246 | .065[2] | .262 |
| [1] Basin Plan Objective for San Luis Rey, Basin Plan Table 3-2 | | | | | | |
| [2] California Toxics Rule Limit | | | | | | |
| [3] EPA Multi Sector General Permit Benchmark, Table 8.M-1 | | | | | | |

Every day Pick Your Part Owners and/or Operators discharged or continue to discharge polluted storm water in violation of the Discharge Prohibitions and Receiving Water Limitations of the New Industrial Permit is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).The Pick Your Part Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since Pick Your Part's enrollment. These violations are ongoing and will continue each day contaminated storm water

**Notice of Intent to Sue: Clean Water Act**
*Pick Your Part*
**December 21, 2016**
**Page 4**

is discharged in violation of the requirements of the Permit.

       **C.**    **Failure to Develop and/or Implement BMPs that Achieve Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology**

The New Industrial Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in storm water discharges and authorized non-storm water discharges through implementation of the Best Available Technology Economically Achievable (BAT) for toxic pollutants[2] and Best Conventional Pollutant Control Technology (BCT) for conventional pollutants.[3] Specifically, the Permit "requires control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." (New Industrial Permit, §I.D.32; see also, §V.A.).

EPA Benchmarks are the pollutant concentrations which generally indicate whether a facility has successfully developed or implemented BMPs that meet the BAT/BCT. Discharges with pollutant concentration levels above EPA Benchmarks and/or the CTR demonstrate that a facility has failed to develop and/or implement BMPs that achieve compliance with BAT for toxic pollutants and BCT for conventional pollutants. The Facility's monitoring data demonstrates consistent exceedances of not only the CTR, but also EPA benchmarks. (See monitoring data above and Ecology's historical monitoring data).[4]

Thus, Pick Your Part (and Ecology's) storm water discharge sampling data demonstrates the Facility has not developed and/or implemented BMPs that meet the standards of BAT/BCT. (See *Baykeeper, supra*, 619 F.Supp. 2d at 925 ["Repeated and/or significant exceedances of the Benchmark limitations should be relevant" to the determination of meeting BAT/BCT]).

Further information available to CERF indicates Pick Your Part has failed to implement and/or develop BMPs that meet BAT and BCT. As noted in the Facility's SWPPP, minimal, ineffective advanced BMPs are used at the Facility. (SWPPP, p. 15). Notably, no filtration devices are installed to address the Facility's discharge of metals and oil and grease. (*Id.*).

Notably, Permit Effluent Limitation V.A. is a separate requirement, independent of the iterative process triggered by exceedances of the Permit's NALs. "The NALs are not intended to serve as technology-based or water quality-based numeric effluent limitations. The NALs are not derived directly from either BAT/BCT requirements or receiving water objectives." (Industrial Permit, §I.M.63). Thus, the NALs do not represent technology-based criteria relevant to determine whether an industrial facility has implemented BMPs that achieve BAT/BCT. Therefore, development of an Exceedance Response Action Plan pursuant to Permit Section

---

[2] Toxic pollutants are found at 40 CFR § 401.15 and include, but are not limited to: lead, nickel, zinc, silver, selenium, copper, and chromium.

[3] Conventional pollutants are listed at 40 CFR § 401.16 and include biological oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

[4] For example, Ecology's November 29, 2013 monitoring data showed exceedances of lead, iron, zinc, copper, and aluminum water quality objectives and benchmark exceedances for TSS, COD, and specific conductance.

Notice of Intent to Sue: Clean Water Act
*Pick Your Part*
December 21, 2016
Page 5

XII neither addresses nor alleviates the aforementioned violations of Effluent Limitation V.A.

In summary, the Pick Your Part Owners and/or Operators are seriously in violation of Section V.A. of the Industrial Permit. Every day Pick Your Part operates with inadequately developed and/or implemented BMPs in violation of the BAT/BCT requirements is a separate and distinct violation of the Permit and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311 (a)). Therefore, Pick Your Part has been in daily and continuous violation of the BAT/BCT requirements of the Industrial Permit every day since at least June 12, 2015, and is subject to penalties for all such violations.

These violations are ongoing and Pick Your Part will continue to be in violation every day it fails to develop and/or implement BMPs that achieve BAT/BCT to prevent or reduce pollutants associated with industrial activity in storm water discharges at the Facility.

### D.     Inadequate Storm Water Pollution Prevention Plan

One of the main requirements of the Industrial Permit (and New Industrial Permit) is the Storm Water Pollution Prevention Plan (SWPPP). (Industrial Permit §A; New Industrial Permit, Finding I.54, §X).  Pick Your Part has not developed an adequate SWPPP as required by the New Industrial Permit.

The Pick Your Part SWPPP dated June12, 2015 fails to adequately assess the Facility's potential contribution of 303(d) listed pollutants to receiving waters. Per section X.G.2.a.ix of the New Industrial Permit, the Pick Your Part Owners and/or Operators are required to assess the potential industrial pollutant sources to receiving waters with 303(d) listed impairments identified in Appendix 3. (New Industrial Permit, §X.G.2.a.ix). The lower reach of San Luis Rey River is listed as impaired on the 2012 Integrated Report for numerous constituents, including: chloride, enterococcus, fecal coliform, phosphorus, total dissolved solids, total nitrogen, and toxicity. Though the SWPPP identifies the numerous pollutants for which San Luis Rey is listed, it summarily dismisses the potential of such pollutants onsite "through knowledge of processes." (SWPPP, p. 10). This is completely inadequate – especially because the EPA fact sheet for sector M, automobile salvage yards, identifies phosphorous as a common pollutant associated with vehicle equipment, and parts washing areas.[5]

The Facility has also historically (as Pick Your Part and Ecology Auto Wrecking) discharged contaminated storm water containing copper, zinc and COD at levels which exceed the NALs (and CTR for metals). The SWPPP fails to include these constituents as part of the Facility's monitoring protocol or mention the historic exceedances, in violation of the New Industrial Permit. (New Industrial Permit, §XI.B.6.c.).

Indeed, the Facility's SWPPP is virtually identical to the Ecology Auto Wrecking SWPPP. (Ecology SWPPP, dated June 22, 2015). In light of Ecology's numerous exceedances of water quality objectives for copper, zinc, lead, iron, aluminum, TSS, and COD, Pick Your Part's wholesale implementation and plagiarism of Ecology's SWPPP virtually ensured the Facility's continued failure to protect water quality and comply with the New Industrial Permit.

---

[5] https://www.epa.gov/sites/production/files/2015-10/documents/sector_m_autosalvage.pdf

Notice of Intent to Sue: Clean Water Act
*Pick Your Part*
December 21, 2016
Page 6

Ecology enrolled under the Industrial Permit under 5093 because of its onsite scrap and recycling activities.[6] Ironically, despite its reliance on the Ecology SWPPP and though it simply took over Facility operations for Ecology, Pick Your Part has failed to acknowledge its scrap metal and recycling activities under SIC code 5093. Notably, facilities with SIC code 5093 must sample for copper, zinc and COD – all constituents historically found at the Facility.

Further, the SWPPP identifies Veronica Chavez as the only person on the pollution prevention team. (SWPPP, p. 6). However, the New Industrial Permit requires identification of "team members assigned to conduct the monitoring requirements." (New Industrial Permit, §X.I.1.). Pick Your Part has failed to identify Ms. Chavez, or anyone else, as the team member responsible for conducting monitoring.

The Facility site map also fails to meet the requirements of the New Industrial Permit. Adopted wholesale from Ecology, the map fails to include the discharge and sampling locations, identify San Luis Rey as the "nearby water body" and adjacent receiving water, and identify locations where materials are exposed to precipitation, areas of industrial activity subject to the Permit, including storage areas, shipping and receiving areas, vehicle and equipment storage and maintenance areas, or material handling and processing areas. (New Industrial Permit §X.E.3a.-f.).

Lastly, despite the numerous and egregious water quality violations established by Pick Your Part's monitoring data, the SWPPP BMPs have not been updated to address such exceedances.

Every day the Pick Your Part Owners and/or Operators operate the Facility without an adequate SWPPP constitutes a separate and distinct violation of the Industrial Permit, the New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Pick Your Part Owners and/or Operators have been in daily and continuous violation of the Industrial Permit since at least June 12, 2015. These violations are ongoing and the Pick Your Part Owners  and/or Operators will continue to be in violation every day they fail to address the SWPPP inadequacies. Thus, the Pick Your Part Owners and/or Operators are liable for civil penalties of up to $37,500 per day for violations prior to November 2, 2015, and $51,570 per day of violations occurring after November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; Industrial Permit, §XXI.Q.1).

### E.      Failure to Monitor

The Pick Your Part Owners and/or Operators have failed to sample as required during the 2015-2016 wet season. Only one rain event was monitored, though there were numerous qualifying rain events. (See Exhibit A, 2015-2016 Precipitation Data).

The New Industrial Permit requires dischargers to take two samples between July 1 and December 31 and two samples between January 1 and June 30. (New Industrial Permit, §XI.B.2). Indeed, the Pick Your Part SWPPP, dated June 12, 2015, specifically acknowledges the "sampling frequency was increased to require two (2) sampling events within the first half of each reporting year (July 1 to December 31) and two (2) sampling events within the second half

---

[6] The Department of Labor description of SIC Code 5093 includes "Automotive wrecking for scrap-wholesale."

of each reporting year (January 1 to June 30)..." (SWPPP, p. 3). The SWPPP also states the Facility "has prepared a site-specific storm water monitoring program for this facility to maintain compliance with the [New Industrial Permit]." (SWPPP, p. 20). Nonetheless, Pick Your Part has failed to comply with these requirements.

Pick Your Part has also failed to sample for COD. Ecology's historical monitoring data indicates this is a constituent of concern at the site, triggering the requirement to continue monitoring under the New Industrial Permit. Pick Your Part's failure to do so is an additional violation of the New Industrial Permit. (New Industrial Permit, §XI.B.6.c.).

Every day the Pick Your Part. Owners and/or Operators failed to adequately monitor the Facility is a separate and distinct violation of the Industrial Permit, New Industrial Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These violations are ongoing and the Pick Your Part Owners and/or Operators will continue to be in violation every day they fail to adequately monitor the Facility. The Pick Your Part Owners and/or Operators are thus subject to penalties in accordance with the Industrial Permit – punishable by a minimum of $37,500 per day of violations prior to November 2, 2015, and $51,570 per day of violations occurring after November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; Industrial Permit, §XXI.Q.1).

## F.   Falsification of Reports

Section XVI. of the Industrial Permit requires dischargers to submit Annual Reports by July 15th following each reporting year. The Annual Report must include a completed compliance checklist that indicates whether a discharger has complied with and addressed all applicable requirements of the Permit. (New Industrial Permit, §XVI.B.1.). The Permit contains numerous additional provisions which ensure the accuracy of reported information. For example, Section XXI.J. requires dischargers take samples and measurements that are "representative of the monitored activity." Further, the Legally Responsible Person or Duly Authorized Representative must certify all documents submitted via SMARTS. (New Industrial Permit, §XXI.K.1.). Any person signing, certifying, or submitting such documents does so under penalty of perjury. (New Industrial Permit, §XXI.L.).

Both the Industrial Permit and the Clean Water Act make it unlawful to falsify reports, punishable by a $10,000 fine or by imprisonment, or both. (Industrial Permit, §XXI.N; 33 U.S.C. §1319(c)(1)). In addition to knowing falsification, negligent violation of the Clean Water Act is also punishable through criminal penalties. (33 U.S.C. §1319(c)(1)).

The 2015-2016 Annual Report for the Facility, certified under penalty of perjury by Pick Your Part Plant Manager Veronica Chavez, contains false information. In Attachment 1, as justification for Pick Your Part's failure to conduct visual observations of all sampling events and sample the required number of qualifying storm events, Ms. Chavez stated Pick Your Part was "unaware of the requirement will do so going forward" and "unaware of the requirement until we took storm water training" respectively. This is false.

In its July 14, 2015 Notice of Termination, prior owner Ecology Auto Wrecking certified that it had "notified the new owner/operator of the storm water NPDES permit requirements" and listed American Recycling's William Blasini as the point of contact for Pick Your Part. Further, the Facility's June 12, 2015 SWPPP explicitly details the requirement to sample four qualifying storm events per year in numerous locations. (SWPPP, pp. 3 and 20). Ms. Chavez's claim of

ignorance is therefore factually incorrect. It also does not constitute a legal defense for failure to comply with the Permit requirements. (*U.S. v. Weitzenhoff* (9th Cir. 1993) 35 F.3d 1275, 1284 ["criminal sanctions are to be imposed on an individual who knowingly engages in conduct that results in a permit violation, <u>regardless of whether the polluter is cognizant of the requirements or even the existence of the permit</u>"] emphasis added; *U.S. v. Sinskey* (8th Cir. 1997) 119 F.3d 712, 715–16 ["Given this interpretation of the statute, the government was not required to prove that Sinskey knew that his acts violated either the CWA or the NPDES permit, but merely that he was aware of the conduct that resulted in the permit's violation."]).

Therefore, Pick Your Part and Ms. Chavez are in violation of the Industrial Permit and Clean Water Act Section 309.

Every day the Pick Your Part Owners and/or Operators fail to submit an accurate Annual Report for the Facility is a separate and distinct violation of the Industrial Permit and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311(a)). Pick Your Part has been in daily and continuous violation of the Industrial Permit's reporting requirements every day since at least July 13, 2016. These violations are ongoing and the Pick Your Part Owners and/or Operators, as well as Ms. Chavez, will continue to be in violation every day they fail to revise and submit an accurate 2015-2016 Annual Report.

### G.    Inadequate Level 1 ERA Report

The Pick Your Part Level 1 ERA Report, dated December 7, 2016, is woefully inadequate. As a preliminary matter, the Report only mentions the Facility's NAL exceedances for TSS, oil and grease, aluminum, and iron. (Level 1 ERA Report, p. 2). However, the Facility has exceeded NALs for zinc and copper as well. (May 6, 2016 Monitoring Report). The Report fails to address these exceedances in its evaluation or SWPPP revisions and additional BMPs. Pick Your Part has therefore failed to comply with New Industrial Permit Sections XII.A-C.

Notably, the other LKQ Pick Your Part facilities within Region 9 all failed to sample as required (only sampling once or twice), all had NAL exceedances for metals, and all prepared similarly deficient Level 1 ERA Reports (prepared by the same QISP).[7] None of the Level 1 ERA Reports require filtration or other advanced BMPs. Rather, they rely on increased housekeeping and berms which fail to adequately address metal particulates and NAL exceedances.

Every day the Pick Your Part Owners and/or Operators fail to submit an adequate Level 1 ERA Report is a separate and distinct violation of the Industrial Permit and Section 301(a) of the Clean Water Act. (33 U.S.C. § 1311(a)). These violations are ongoing and the Pick Your Part Owners and/or Operators will continue to be in violation every day they fail to revise and submit an appropriate Level 1 ERA Report.

### III.   Remedies

Upon expiration of the 60-day period, CERF will file a citizen suit under Section 505(a) of the Clean Water Act for the above-referenced violations. During the 60-day notice period, however, CERF is willing to discuss effective remedies for the violation noted in this letter. If you

---

[7] See ERA Report for facilities at 800 Energy Way, Chula Vista, 825 Energy Way, Chula Vista, 850 Energy Way, Chula Vista, and 2315 Carpenter Road, Oceanside.

**Notice of Intent to Sue: Clean Water Act**
*Pick Your Part*
**December 21, 2016**
**Page 9**

wish to pursue such discussions in the absence of litigation, it is suggested that you initiate those discussions immediately. If good faith negotiations are not being made, at the close of the 60-day notice period, CERF will move forward expeditiously with litigation.

Pick Your Part must develop and implement a SWPPP which complies with all elements required in the New Industrial Permit, and address the consistent, numerous, and ongoing water quality violations at the Facility. Should the Pick Your Part Owners and/or Operators fail to do so, CERF will file an action against Pick Your Part for its prior, current, and anticipated violations of the Clean Water Act.

CERF's action will seek all remedies available under the Clean Water Act §1365(a)(d). CERF will seek the maximum penalty available under the law which is $37,500 per day of violations prior to November 2, 2015, and $51,570 per day of violations occurring after November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; Industrial Permit, §XXI.Q.1). CERF may further seek a court order to prevent Pick Your Part from discharging pollutants. Lastly, section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorneys' and experts' fees. CERF will seek to recover all of its costs and fees pursuant to section 505(d).

### IV.   Conclusion

CERF has retained legal counsel to represent it in this matter. Please direct all communications to Coast Law Group:

> **Marco A. Gonzalez**
> **COAST LAW GROUP LLP**
> **1140 S. Coast Highway 101**
> **Encinitas, CA 92024**
> **Tel: (760) 942-8505 x 102**
> **Fax: (760) 942-8515**
> **Email: marco@coastlawgroup.com**

CERF will entertain settlement discussions during the 60-day notice period. Should you wish to pursue settlement, please contact Coast Law Group LLP at your earliest convenience.

Sincerely,

**COAST LAW GROUP LLP**

**Marco A. Gonzalez**

**Livia Borak Beaudin**
Attorneys for
Coastal Environmental Rights Foundation

cc:

**Notice of Intent to Sue: Clean Water Act**
*Pick Your Part*
**December 21, 2016**
**Page 10**

| | |
|---|---|
| Alexis Strauss<br>Acting Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA, 94105 | Dave Gibson, Executive Officer<br>Catherine Hagan, Staff Counsel<br>San Diego Regional Water Quality Control Board<br>2375 Northside Drive, Suite 100<br>San Diego, CA 92108-2700 |
| Gina McCarthy<br>EPA Administrator<br>William Jefferson Clinton Building<br>1200 Pennsylvania Avenue N.W.<br>Washington, DC 20004 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, CA 95812–0110 |