1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COASTAL ENVIRONMENTAL RIGHTS FOUNDATION,<br><br>                              Plaintiff,<br><br>     v.<br><br>AMERICAN RECYCLING INTERNATIONAL, INC. dba LKQ PICK YOUR PART OCEANSIDE,<br><br>                              Defendant. | Case No. 17-cv-00425-BAS-JMA<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>**[ECF No. 7]** |

Plaintiff Coastal Environmental Rights Foundation brings this lawsuit against Defendant American Recycling International, Inc., which is doing business as LKQ Pick Your Part Oceanside, for violations of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act" or "CWA").

Presently before the Court is Defendant's motion to dismiss Plaintiff's action for lack of subject matter jurisdiction and for failure to state a claim. (ECF No. 7.) Defendant argues that dismissal is proper because (i) Plaintiff's sixty-day pre-suit notice does not meet the Clean Water Act's requirements and (ii) Plaintiff's legal theories rely on a misinterpretation of the permit that governs Defendant's storm water discharges. (*Id.*) Plaintiff opposes. (ECF No. 14.)

The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the reasons discussed below, the Court **DENIES** Defendant's motion to dismiss.

## I.   <u>BACKGROUND</u>

Plaintiff is a California non-profit public benefit corporation with its office in Encinitas, California. (Compl. ¶¶ 7–8, ECF No. 1.) The public and members of Plaintiff's organization use the San Luis Rey River—a river located in northern San Diego County—and the Pacific Ocean to "fish, sail, boat, kayak, surf, swim, scuba dive, birdwatch, view wildlife, and to engage in scientific studies." (*Id.* ¶¶ 10–11.) Plaintiff alleges that Defendant's storm water discharges from its industrial facility into the San Luis Rey River, and ultimately the Pacific Ocean, affect and impair each of these uses and thus pose a continuous threat to Plaintiff's members' interests. (*Id.* ¶¶ 5, 12.)

### A.   <u>Defendant's Industrial Operations</u>

Defendant is a California corporation that operates an industrial facility in Oceanside, California. (Compl. ¶¶ 5, 14.) This facility is a fourteen-acre automobile salvage establishment that is classified under "standard industrial classifications (SIC) code . . . 5015," which applies to "establishments primarily engaged in dismantling used motor vehicles for the purpose of selling parts." (*Id.* ¶ 44.)

More specifically, Defendant's relevant industrial activities include "junk vehicle storage, vehicle loading and unloading, battery removal, dismantling, cutting and baling, and vehicle maintenance, fueling, and washing activities." (Compl. ¶ 45.) Potential pollutant sources involved in these activities include: "scrap metal outdoor storage areas; oil and lubricant storage; battery storage areas; equipment and container storage areas; loading and unloading areas; maintenance areas; hazardous waste storage areas; and the on-site material handling equipment such as forklifts."

(*Id.* ¶ 64.) Particularly, Plaintiff describes "containers stored on-Site that are uncovered and/or uncontained" as potential sources of pollutants, (*id.* ¶ 67), and alleges that Defendant's pollution control protocols are inadequate to prevent contamination of storm water, (*id.* ¶ 72).

As a result of Defendant's industrial activities and alleged inadequate controls, Plaintiff contends that "particulates from operations, oil, grease, suspended solids, hazardous waste, phosphorous, and metals such as aluminum, iron, copper, lead, and zinc materials are exposed to storm water" at the facility. (Compl. ¶ 48.) Plaintiff further alleges that this contaminated storm water is then discharged "into the City of Oceanside's storm water conveyance systems or directly to the San Luis Rey River" from a single discharge point, (*id.* ¶ 49), where it causes or contributes "to the impairment of water quality in the San Luis Rey River," (*id.* ¶ 55). To support its allegations, Plaintiff presents Defendant's storm water sampling data from May 2016, which show measurements of various pollutants in excess of water quality criteria found in the Water Quality Control Plan for the San Diego Basin[1] and promulgated by the U.S. Environmental Protection Agency ("EPA"). (*Id.* ¶¶ 57, 77–81.)

---

[1] The California Water Code requires each regional water board to "formulate and adopt water quality control plans for all areas within the region." Cal. Water Code § 13240. This case implicates the California Regional Water Quality Control Board for the San Diego Region ("Regional Water Board"). *See id.* § 13200(f). The Regional Water Board has adopted the Water Quality Control Plan for the San Diego Basin ("San Diego Basin Plan"). Cal. Code Regs. tit. 23, § 3983; San Diego Basin Plan (as amended May 17, 2016), https://www.waterboards.ca.gov/sandiego/water_issues/programs/basin_plan/.

The San Diego Basin Plan "is designed to preserve and enhance water quality and protect the beneficial uses of all regional waters." San Diego Basin Plan at 1-1. In particular, "the Basin Plan: (1) designates beneficial uses for surface and ground waters; (2) sets narrative and numerical objectives that must be attained or maintained to protect the designated beneficial uses and conform to the state's antidegradation policy; (3) describes implementation programs to protect the beneficial uses of all waters in the Region; and (4) describes surveillance and monitoring activities to evaluate the effectiveness of the Basin Plan." *Id.*

### B.    Alleged Clean Water Act Violations

Based on this backdrop, Plaintiff alleges that since Defendant commenced its operations in July 2015, Defendant has discharged contaminated storm water in violation of the Clean Water Act and the requirements of California's National Pollution Discharge Elimination System ("NPDES") General Permit for Storm Water Discharges Associated with Industrial Activities ("Permit"). (Compl. ¶¶ 5, 76–82, 85, 102–12; *see also* Permit, Def.'s Req. for Judicial Notice ("RJN") Ex. A, ECF No. 8-1.) Likewise, Plaintiff alleges that Defendant has failed to develop and implement a Storm Water Pollution Prevention Plan ("Pollution Prevention Plan") that meets the requirements of the NPDES Permit.[2] (Compl. ¶¶ 84, 122–29.)

More specifically, Plaintiff asserts that Defendant's industrial activities and corresponding Pollution Prevention Plan have violated the following substantive and procedural requirements of the Permit. First, Plaintiff contends that Defendant has failed to identify and implement site-specific Best Management Practices to reduce or prevent the discharge of pollutants. (Compl. ¶¶ 83, 86.) In addition, Plaintiff alleges a pattern of ongoing noncompliance with various storm water monitoring and reporting requirements. (*Id.* ¶¶ 98–101.) Plaintiff asserts that Defendant has failed to (i) implement an adequate Monitoring & Reporting Program[3] as a component of the Pollution Prevention Plan, (ii) conduct required sampling of storm water for pollutants, and (iii) submit accurate reports of sampling data to the State Water Board. (*Id.* ¶¶ 98–101, 130–33, 140–42, 145–46.) Finally, Plaintiff alleges that Defendant has failed to meet certain remedial Permit requirements after its samples

---

[2] The Permit and its accompanying Fact Sheet provide definitions for various terms used throughout this order. (*See generally* Permit Glossary, Permit Attachment C; Permit Fact Sheet.) The Court capitalizes these terms in this order to signify that—unless otherwise noted—the Court is borrowing the terms' meanings from the Permit.

[3] Permit § XI requires dischargers to complete an assortment of monitoring and reporting requirements, including visual observations and storm water sampling. Further, Permit § X.I requires dischargers to include in their Pollution Prevention Plans a "Monitoring Implementation Plan" for executing the Permit's monitoring and reporting requirements. The Court uses the term "Monitoring & Reporting Program" to refer to these requirements.

– 4 –

showed excessive discharges of pollutants. (*Id.* ¶¶ 158–60; Pre-Suit Notice 3, Compl. Ex. A.)

Pursuant to the CWA, Plaintiff issued a sixty-day pre-suit notice ("Pre-Suit Notice") to Defendant on December 21, 2016, regarding its alleged violations of the CWA and Plaintiff's intention to file suit against Defendant. *See* 33 U.S.C. § 1365(b)(1)(A). (*See also* Pre-Suit Notice, Compl. Ex. A.)[4] Plaintiff also submitted the Notice to the Administrator of the EPA, the Administrator of EPA Region IX, the Executive Director of the State Water Board, and the Executive Officer of the Regional Water Board. (Compl. ¶ 2.) Plaintiff then filed its Complaint against Defendant on March 1, 2017. Defendant now moves to dismiss the Complaint for lack of subject matter jurisdiction and several of Plaintiff's causes of action for failure to state a claim upon which relief may be granted.[5]

---

[4] Courts usually may not consider material outside the complaint when ruling on a motion to dismiss. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Because Plaintiff attached its Pre-Suit Notice to the Complaint and incorporated the document therein, (Compl. ¶ 2, Ex. A), the Court considers it in adjudicating the instant motion to dismiss, *see Ritchie*, 342 F.3d at 908.

[5] Defendant requests that this Court take judicial notice of the 2015 Permit (Def.'s RJN Ex. A); the previous version of the Permit (*id.* Ex. B); Defendant's most recent sampling data (*id.* Ex. C); its Level 1 Exceedance Response Action Report (*id.* Ex. D); and its 2015 Pollution Prevention Plan (*id.* Ex. E). The Court may take judicial notice of facts not subject to reasonable dispute if they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b)(2). That Defendant's sampling data, response report, and Pollution Prevention Plan have been filed with the State Water Board as public records is a fact subject to judicial notice. Similarly, the Court may take judicial notice of what these documents contain. The Court will not, however, consider Defendant's administrative filings as evidence of the truth of any assertions made therein. *See, e.g.*, *Romero v. Securus Techs., Inc.*, 216 F. Supp. 3d 1078, 1084 n.1 (S.D. Cal. 2016) ("While matters of public record are proper subjects of judicial notice, a court may take notice only of the existence and authenticity of an item, not the truth of its contents."). The Court may also take judicial notice of administrative orders, rules, and guidance, such as the State Water Board's storm water permits. *See, e.g.*, *United States v. Woods*, 335 F.3d 993, 1000–01 (9th Cir. 2003). Hence, the Court grants Defendant's request to take judicial notice of the two versions of the Permit. Likewise, the Court also grants Plaintiff's request to judicially notice the San Diego Basin Plan (Pl.'s RJN Ex. 1, ECF No. 16) and the EPA's NPDES Permit Writers' Manual (*id.* Ex. 2), which are also matters of public record.

## II.   SUBJECT MATTER JURISDICTION

### A.   Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges the court's jurisdiction over the subject matter of the complaint. "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "They possess only that power authorized by Constitution or a statute, which is not to be expanded by judicial decree." *Id.* (citations omitted). "It is to be presumed that a cause lies outside this limited jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted); *see also Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006).

Federal district courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A plaintiff invoking this jurisdiction must show "the existence of whatever is essential to federal jurisdiction," and if the plaintiff fails to do so, the court "must dismiss the case, unless the defect [can] be corrected by amendment." *Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) (per curiam) (quoting *Smith v. McCullough*, 270 U.S. 456, 459 (1926)), *abrogated on other grounds by Hertz Corp v. Friend*, 559 U.S. 77 (2010).

Further, the doctrines of ripeness and mootness also relate to a federal court's subject matter jurisdiction, and so challenges to a claim on either ground are properly raised in a Rule 12(b)(1) motion. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010); *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

### B.   Analysis

Defendant moves to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). Defendant makes two jurisdictional challenges. At the threshold, Defendant argues that Plaintiff's Pre-Suit Notice is insufficient to confer jurisdiction over this

citizen suit under the Clean Water Act. (Mot. 11:1–15:21.) Next, Defendant contends that it voluntarily ceased the conduct underlying several of the alleged Clean Water Act violations before Plaintiff commenced this action. (*Id*. 25:11–28:20.) Thus, Defendant argues three of Plaintiff's causes of action are moot. (*Id.*) As explained below, the Court rejects these challenges.

### 1.    The Clean Water Act's Pre-Suit Notice Requirements

For a court to have jurisdiction over a CWA citizen suit, the plaintiff must have "given notice of the alleged violation (i) to the [EPA's] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator" at least sixty days before commencing the action. 33 U.S.C. § 1365(b)(1)(A). Adequate notice must "include sufficient information to permit the recipient to identify": (1) "the specific standard, limitation, or order alleged to have been violated"; (2) "the activity alleged to constitute a violation"; (3) "the person or persons responsible for the alleged violation"; (4) "the location of the alleged violation"; (5) "the date or dates of such violation"; and (6) "the full name, address, and telephone number of the person giving notice" and "of the legal counsel, if any, representing the person giving the notice." 40 C.F.R. § 135.3(a), (c). This requirement serves the dual purposes of allowing the violator time to bring itself into compliance with the CWA and alerting appropriate agencies so that administrative action may provide relief. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987). The Ninth Circuit has embraced "a strict construction of the notice requirement" as "best further[ing] the statute's goal[s]." *See Wash. Trout v. McCain Foods, Inc.*, 45 F.3d 1351, 1354 (9th Cir. 1995); *see also Cmty. Ass'n for Restoration of the Env't v. Henry Bosma Dairy*, 305 F.3d 943, 950–51 (9th Cir. 2002).

Defendant argues that Plaintiff's Pre-Suit Notice is insufficient to confer jurisdiction over this citizen suit on two grounds. First, Defendant attacks the Notice because although the letter identifies the contact information for Plaintiff's counsel,

it does not specifically identify Plaintiff's contact information. (Mot. 12:17–14:2.) Consequently, Defendant argues the Notice does not meet the "strict construction of the notice requirement" embraced by the Ninth Circuit in cases like *Washington Trout v. McCain Foods, Inc.*, 45 F.3d at 1354.

To illustrate, in *Washington Trout*, three plaintiffs brought a citizen suit against the defendant. 45 F.3d at 1352. Only one of these plaintiffs had sent a pre-suit notice, which was sent on behalf of itself, "among perhaps others." *Id.* at 1352. Thus, the notice did not "furnish the identity, address, and phone number" of the other two plaintiffs. *Id.* Subsequently, the plaintiff who sent the pre-suit notice was dismissed from the suit, leaving the two unidentified plaintiffs in the action. *Id.* The Ninth Circuit held that the single notice was inadequate to confer jurisdiction over the remaining two plaintiffs' citizen suit. *Id.* at 1354–55. The court reasoned that because the defendant did not know "other plaintiffs were involved," it was "not in a position to negotiate with the plaintiffs or seek an administrative remedy." *See id.* at 1354. In other words, the pre-suit notice was insufficient because it "made any sort of resolution between the parties during the notice period an impossibility." *See id.* The Ninth Circuit held the district court therefore correctly dismissed the action for lack of subject matter jurisdiction. *Id.* at 1355.

Plaintiff's Pre-Suit Notice is readily distinguishable from the deficient notice provided in *Washington Trout*. Unlike that case, there is only one plaintiff here. Further, Plaintiff's Pre-Suit Notice includes Plaintiff's full name as well as that of its counsel. (Pre-Suit Notice 1.) Given that the Pre-Suit notice identifies the relevant parties, indicates that Plaintiff is represented by counsel, provides Plaintiff's counsel's contact information, and requests that all communications to Plaintiff be directed to its counsel, "[t]here can be no doubt about with whom [Defendant] needed to conduct negotiations." *See Nat. Res. Def. Council, Inc. v. Sw. Marine, Inc.* ("*NRDC I*"), 945 F. Supp. 1330, 1333 (S.D. Cal. 1996), *aff'd*, 236 F.3d 985 (9th Cir. 2000) (finding that a notice letter was adequate where it provided the required information

for a plaintiff organization but did not provide separate contact information for the organization's executive director, an individual plaintiff). As a result, the Pre-Suit Notice is sufficient to meet the regulation's objective of "provid[ing] a period for nonadversarial negotiation, which would be circumvented by failing to identify all of the parties involved." *See N. Cal. River Watch v. Fluor Corp.*, No. 10-CV-05105-MEJ, 2014 WL 3385287, at *14 (N.D. Cal. July 9, 2014); *see also Wash. Trout*, 45 F.3d at 1354.

Moreover, Plaintiff's Pre-Suit Notice meets the technical requirements of 40 C.F.R. § 135.3(a), (c) in that it does provide "the full name, address, and telephone number" of both "the person giving notice" (Plaintiff) and "the legal counsel, if any, representing the person giving the notice." (*See* Pre-Suit Notice 1.) While the Pre-Suit Notice does not explicitly identify Plaintiff's contact information, the organization shares the same phone number and address as its counsel. (*See* Pre-Suit Notice 1, 9; *see also* Compl. ¶ 8.)[6] Accordingly, the Court rejects Defendant's first challenge to the sufficiency of the Pre-Suit Notice.

Second, Defendant argues dismissal is warranted because Plaintiff's nine-page Pre-Suit Notice fails to identify the industrial activities that underlie Plaintiff's causes of action. (Mot. 14:3–15:21.) This argument runs contrary to the contents of the Notice. The Pre-Suit Notice identifies Defendant's facility as an "automobile salvage yard[]" classified in Defendant's Pollution Prevention Plan under SIC code 5015.

---

[6] The Court also notes that Plaintiff's address is a matter of public record, discernable with only a few keystrokes. The Pre-Suit Notice includes Plaintiff's legal name and identifies it as "a non-profit public benefit corporation organized under the laws of the State of California with its main office in Encinitas, CA." (Pre-Suit Notice 2.) A free, online search of California's Secretary of State's business records, which involves no more than typing Plaintiff's name into a search box, reveals Plaintiff's registered address is 1140 S. Coast Highway 101, Encinitas, CA 92024. Business Search – Results, Cal. Sec'y of State, https://businesssearch.sos.ca.gov/ (enter search criteria "Coastal Environmental Rights Foundation"). This address is the same one found in the Pre-Suit Notice. Simply put, this case is not one where the claimed defects in Plaintiff's Pre-Suit Notice "made any sort of resolution between the parties during the notice period an impossibility." *See Wash. Trout*, 45 F.3d at 1354.

(Pre-Suit Notice 5–6.) In light of Defendant's knowledge of its own automobile salvage activities, the definition of SIC code 5015,[7] and the single storm water discharge point at issue, Defendant cannot plausibly claim that it was not "well aware of the relevant parties involved, the activities that took place on the Site, and the person or persons allegedly responsible." *See N. Cal. River Watch*, 2014 WL 3385287, at *14; *see also Henry Bosma Dairy*, 305 F.3d at 951 ("The key language in the notice regulation is the phrase 'sufficient information to permit the recipient to identify' the alleged violations and bring itself into compliance." (quoting 40 C.F.R. § 135.3(a))). Furthermore, Plaintiff's Pre-Suit Notice goes on to allege that Defendant is engaged in scrap metal and recycling activities not adequately captured by SIC code 5015 or by its Pollution Prevention Plan. (Pre-Suit Notice 6.)

Finally, many of Plaintiff's allegations relate to Defendant's inadequate development and implementation of its Pollution Prevention Plan and corresponding Monitoring & Reporting Program. (*See generally* Pre-Suit Notice.) Accordingly, insofar as the "suit is about the failure to prepare environmental compliance and monitoring plans for an entire facility . . . it is legitimate to allege that the violations are occurring at the facility in general." *See NRDC I*, 945 F. Supp. at 1333. Moreover, Defendant's sampling of two storm events in January 2017—three and four weeks after it received Plaintiff's Pre-Suit Notice claiming it had failed to conduct adequate sampling—demonstrates that Defendant understood at least some of Plaintiff's allegations with respect to its deficient Monitoring & Reporting Program. *See Nat. Res. Def. Council v. Sw. Marine, Inc.* ("*NRDC II*"), 236 F.3d 985, 997 (9th Cir. 2000) (reasoning that the defendant "obviously understood at least some of the alleged

---

[7] According to the Department of Labor, SIC code 5015 (Motor Vehicle Parts, Used) applies to "establishments primarily engaged in the distribution at wholesale or retail of used motor vehicle parts . . . [and] establishments primarily engaged in dismantling motor vehicles for the purpose of selling parts." Dep't of Labor, SIC Manual, Description for 5015: Motor Vehicle Parts, Used. These facilities are distinguished from "establishments primarily engaged in dismantling motor vehicles for scrap[, which] are classified in Industry 5093." *Id.*

violations" where the defendant "completely revised" its Pollution Prevention Plan in response to the plaintiff's letter).

Hence, to the extent Defendant argues that this Court lacks jurisdiction due to the insufficiency of Plaintiff's Pre-Suit Notice, the Court denies Defendant's motion to dismiss.

### 2. Continuous or Intermittent Clean Water Act Violations

The Court turns to Defendant's argument that its voluntary cessation of conduct has mooted part of Plaintiff's action. "The CWA 'does not permit citizen suits for wholly past violations'; rather, the statute 'confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation.'" *NRDC II*, 236 F.3d at 998 (quoting *Gwaltney*, 484 U.S. at 64). Thus, a threshold to jurisdiction is that the plaintiff must allege "continuous or intermittent ongoing NPDES permit violations." *Sierra Club v. Union Oil Co. of Cal.*, 853 F.2d 667, 670 (9th Cir. 1988). "The citizen plaintiff, however, need not prove the allegations of ongoing noncompliance before jurisdiction attaches." *Id.* at 669. Rather, the plaintiff "need only satisfy the good-faith pleading requirements set forth in Rule 11 of the Federal Rules of Civil Procedure." *Id.*

Further, under the "'voluntary cessation' exception to mootness . . . the mere cessation of illegal activity in response to pending litigation does not moot a case, unless the party alleging mootness can show that the 'allegedly wrongful behavior could not reasonably be expected to recur.'" *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). When a defendant seeks to moot an action based on the voluntary cessation of the conduct constituting a violation, courts apply a "stringent" standard. *Laidlaw Envtl. Servs.*, 528 U.S. at 189. Indeed, the defendant bears "[t]he 'heavy burden of persua[sion]' . . . that the allegedly wrongful behavior could not reasonably be expected to recur."

*Id.* (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)).

Defendant moves to dismiss Plaintiff's fourth, fifth, and sixth causes of action as "wholly past" and fully cured in light of its two storm water sampling reports from January 2017. (Mot. 25:17–22, 27:10–20.) These causes of action allege that Defendant has continuously failed to implement an adequate Monitoring & Reporting Program, to conduct required storm water sampling, and to submit accurate reports related to its storm water discharges. (Compl. ¶¶ 130–55.) Plaintiff contends that Defendant's activities, including its inadequate implementation of its Pollution Prevention Plan and corresponding Monitoring & Reporting Program, have not been fully remedied and thus continue to adversely impact Plaintiff's interests. (*Id.* ¶¶ 5, 12, 69–71, 86, 98–101, 153.) Plaintiff therefore sufficiently pleads "continuous or intermittent ongoing NPDES permit violations." *See Sierra Club*, 853 F.2d at 670. And, because Plaintiff meets this requirement, the CWA confers jurisdiction over these claims. *See NRDC II*, 236 F.3d at 998.

In addition, the Court rejects Defendant's position that its voluntary cessation of conduct has mooted some of Plaintiff's claims. Initially, there are evidentiary concerns with Defendant's attempt to rely on only judicial notice of administrative filings to establish that it has now complied with Permit requirements. (*See* Pl.'s Opp'n to Def.'s RJN, ECF No. 15.) *See also, e.g.*, *Romero*, 216 F. Supp. 3d at 1084 n.1 ("While matters of public record are proper subjects of judicial notice, a court may take notice only of the existence and authenticity of an item, not the truth of its contents.") Regardless, however, the Court finds Defendant's sampling reports taken within a single month this year and its other administrative submissions do not meet Defendant's "heavy burden" to show "that the allegedly wrongful behavior could not reasonably be expected to recur." *See Laidlaw Envtl. Servs.*, 528 U.S. at 189 (quoting *Concentrated Phosphate Export Ass'n*, 393 U.S. at 203); *see also Sierra Club*, 853

F.2d at 669 ("The defendant must show that 'there is no reasonable expectation that the wrong will be repeated.'").

Accordingly, because Plaintiff alleges a continuous and ongoing pattern of noncompliance with Permit requirements, and because Defendant does not meet its burden to demonstrate the claims are now moot, the Court denies Defendant's motion to dismiss Plaintiff's fourth, fifth, and sixth causes of action for lack of jurisdiction on mootness grounds.

## III.    FAILURE TO STATE A CLAIM

### A.    Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint.  Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting

*Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alteration in original). A court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. Despite the deference the court must pay to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

### B.    <u>Analysis</u>

Defendant moves under Rule 12(b)(6) to dismiss Plaintiff's first, second, third, fourth, and seventh causes of action for failure to state a claim. As explained below, the Court finds that Plaintiff pleads sufficient facts for these causes of action "to state a claim to relief that is plausible on its face." *See Twombly*, 550 U.S. at 570. Before turning to these claims, however, the Court first reviews the Clean Water Act's permitting scheme that serves as the foundation for all of Plaintiff's causes of action.

### 1.    **The Clean Water Act's Permitting Scheme**

"The objective of the Clean Water Act is to restore and maintain the 'chemical, physical and biological integrity of [the] Nation's waters.'" *Santa Monica Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F. Supp. 2d 936, 939–40 (C.D. Cal. 2009) (alteration in original) (quoting 33 U.S.C. § 1251(a)). Accordingly, the Clean Water Act prohibits "the discharge of any pollutant by any person" into waters of the United States except when discharged in compliance with a National Pollution Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Consequently, any person who discharges pollutants is required to submit an NPDES permit application and comply with the applicable permitting conditions. 40 C.F.R. § 122.21. "Where a permittee discharges pollutants in compliance with the terms of its NPDES permit, the permit acts to 'shield' the permittee from liability under the

CWA." *Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) (citing 33 U.S.C. § 1342(k)). However, "[a]ny permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action." 40 C.F.R. § 122.41. Indeed, "[a] party is strictly liable for NPDES Permit violations under the Clean Water Act; and there are no exceptions for minimal violations or mistakes." *Cal. Sportfishing Prot. All. v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1151 (E.D. Cal. 2016).

### 2.    California's General Industrial Permit

Under the Clean Water Act, the Administrator of the EPA possesses the authority to issue permits under the NPDES, but that authority may be delegated to the states. 33 U.S.C. § 1342(b). The State of California has been granted permitting authority and has issued the Permit implicated here, which applies to industrial storm water discharges. (Permit, Def.'s RJN Ex. A, ECF No. 8-1.)

The parties agree that the Permit applies to Defendant's industrial activities. (*See* Compl. ¶ 44; Def.'s RJN Exs. A, B.) Defendant uses SIC code 5015 (Motor Vehicle Parts, Used) for its facility, (Def.'s RJN Ex. C), but Plaintiff alleges that code 5093 (Scrap and Waste Materials) is the more appropriate SIC code for Defendant's "scrap metal and recycling activities," (Pre-Suit Notice 6).

The Court's task at this point is to determine what Plaintiff is "required to show in order to [allege a violation] of *this particular* NPDES permit." *See Cty. of Los Angeles*, 725 F.3d at 1205 (emphasis in original). This analysis requires that the Court interpret the Permit, which is "treated like any other contract." *See id.* at 1204. "If the language of the permit, considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning.'" *Id.* at 1204–05 (quoting *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 270 (4th Cir. 2001)). "If, however, the permit's

language is ambiguous," the Court may consider extrinsic evidence in interpreting its terms. *See id.* at 1205.

The Permit imposes several types of conditions on storm water dischargers, including: Effluent Limitations, Receiving Water Limitations, and mandatory development and implementation of a Pollution Prevention Plan and corresponding Monitoring & Reporting Program. The Court will address each of these conditions, as well as Plaintiff's corresponding claims, in turn.

### 3.    Effluent Limitations

The Court starts with the Permit's Effluent Limitations, which are contained in § V of the Permit and are implicated by Defendant's challenges to Plaintiff's second and seventh causes of action.

An "Effluent" is "[a]ny discharge of water either to the receiving water or beyond the property boundary controlled by the Discharger." (Permit Glossary 2.) Thus, an "Effluent Limitation" is "[a]ny numeric or narrative restriction imposed on quantities, discharge rates, and concentrations of pollutants that are discharged from point sources into waters of the United States, waters of the contiguous zone, or the ocean." (*Id.*)

The Permit incorporates a form of Effluent Limitations that are referred to as Technology-Based Effluent Limitations. (Permit Fact Sheet § II.D.) These limitations are narrative restrictions based on § 301(b) of the Clean Water Act. (*Id.*; Permit § I.D.31.) *See also* 33 U.S.C. § 1311; 40 C.F.R. §§ 122.44, 125.3. As explored below, the Permit's primary Effluent Limitation is that dischargers must implement certain Best Management Practices at their facilities, and the Permit also uses sampling of Effluents to potentially trigger additional obligations under a performance measurement system.

### a.  Best Management Practices

Dischargers are required to implement Best Management Practices ("BMPs") that comply with the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology standards to reduce or prevent pollutants in storm water discharges. (Permit §§ I.A.1, D.32, V.A.) BMPs are defined broadly to encompass "scheduling of activities, prohibitions of practices, maintenance procedures, and other management practices to reduce or prevent the discharge of pollutants . . . includ[ing] treatment requirements, operating procedures, and practices to control site runoff, spillage or leaks."[8] 40 C.F.R. § 122.2. (*Accord* Permit Glossary 2.)

To comply with the Permit's Effluent Limitations, dischargers must implement the Permit's "minimum BMPs, as well as any advanced BMPs that are necessary to adequately reduce or prevent pollutants in discharges." (Permit Fact Sheet § II.D; *see also* Permit § X.H.1–2.) As explained by the Permit Factsheet, the Effluent Limitations "are based on best professional judgment and are nonnumeric ('narrative') technology-based effluent limitations expressed as requirements for implementation of effective BMPs." (Permit Fact Sheet § II.D.3.) These narrative restrictions are used because it "is infeasible for the State Water Board to develop numeric effluent limitations." (*Id.* § II.D.4.) Accordingly, "[i]t is up to the Discharger, in the first instance, to determine what must be done to meet the applicable effluent limits." (*Id.* § II.D.5.) "Dischargers are required to select, design, install and

---

[8] To illustrate, as part of a hypothetical Pollution Prevention Plan, the Permit Fact Sheet lists potential BMPs a discharger may use to avoid fuel pollution while engaging in vehicle and equipment fueling activities. (Permit Fact Sheet Tbl. 2.) Potential BMPs in this setting might include: (1) using "dry cleanup methods" instead of washing down the fueling area; (2) training employees on proper fueling to avoid spills caused by topping off fuel tanks; and (3) regularly inspecting fueling areas to avoid pollution from leaking storage tanks. (*Id.*)

1  implement BMPs . . . in a manner that reflects best industry practice considering their

2  technological availability and economic practicability and achievability." (*Id.*)

### b. Numeric Action Levels and Exceedance Response Actions

6  In addition to Effluent Limitations that are based on the implementation of

7  adequate BMPs, the Permit incorporates "a multiple objective performance

8  measurement system" that may require a discharger to reevaluate its BMPs and

9  implement additional BMPs. (Permit § I.M.61; *see also id.* § XII.) This system is

10  designed "to inform Dischargers, the public, and the Water Boards on: (1) the overall

11  pollutant control performance at any given facility, and (2) the overall performance

12  of the industrial statewide storm water program." (*Id.* § I.M.61.)

13  The performance measurement system revolves around Numeric Action

14  Levels ("NALs"). (*See* Permit §§ I.M.61–68, XII.) NALs are numeric parameters for

15  common storm water pollutants found in Table 2 of the Permit and "are established

16  as the [EPA's] 2008 MSGP (Multi-Sector General Permit for Stormwater

17  Discharges) benchmark values." (*Id.* § I.M.62.) If an NAL is exceeded, additional

18  obligations under the Permit are triggered. (*See id.* § XII.) An NAL exceedance

19  "occurs when the average of all analytical results from all samples taken at a facility

20  during a reporting year for a given parameter exceeds an annual NAL value"

21  provided in Table 2. (*Id.* § I.M.62.a.) To illustrate, the NAL for mercury is 0.0014

22  milligrams per liter. (*Id.* Tbl. 2.) Therefore, if the average from a discharger's

23  sampling reveals 0.0085 milligrams of mercury per liter, there is an NAL exceedance.

24  (*See id.* § I.M.62.a, Tbl. 2.)

25  That said, NAL values are not used as Technology-Based Effluent Limitations,

26  and exceedances "are not, in and of themselves, [Permit] violations." (Permit

27  § I.M.63.) Rather, a discharger who exceeds an NAL must perform Exceedance

28  Response Actions ("ERAs"). (*Id.* § XII, Permit Fact Sheet §§ I.D.6, II.K, Fig. 3

("Permit Compliance Flowchart").) "The ERAs are divided into two levels of responses." (Permit Fact Sheet § II.K.1.)

To explain, "if sampling results indicate an NAL exceedance," the discharger's status changes from "Baseline" status to "Level 1" ERA status. (Permit § XII.C.) Dischargers in Level 1 ERA status must take additional actions, including (1) conducting an evaluation of potential sources of the NAL exceedance and (2) identifying "the corresponding BMPs . . . and any additional BMPs and [Pollution Prevention Plan] revisions necessary to prevent future NAL exceedances and to comply with the [Permit's] requirements." (*Id.* § XII.C.1.b–c.) A failure to comply with these requirements is a *per se* violation of the Permit. (*Id.* § I.M.63; *see also* Permit Compliance Flowchart.)

If a discharger in Level 1 ERA status continues to have one or more NAL exceedances in the following reporting year, the discharger enters Level 2 ERA status. (Permit § XII.D.) Once again, these NAL exceedances are not *per se* violations of the Permit, but a failure to then comply with the more stringent compliance requirements of Level 2 ERA status is a violation. (*Id.*; *see also* Permit Compliance Flowchart.)

These Permit requirements—that Defendant must (1) satisfy the Effluent Limitations by implementing adequate BMPs and (2) comply with additional obligations upon discovering an NAL exceedance—underpin Plaintiff's second and seventh causes of action. Defendant challenges both claims. (Mot. 21:13–24:17, 29:10–30:15.)

### c.   Inadequate Best Management Practices

Plaintiff's second cause of action alleges that Defendant has failed to comply with the Permit's principal Effluent Limitation that requires dischargers to implement adequate BMPs. (Compl. ¶¶ 114–15.) This claim is based in part on Defendant's sampling results, which show various NAL exceedances—including several reported

concentrations that exceed the corresponding NAL values by a factor of ten or more.[9] (*See id.* ¶ 114, Pre-Suit Notice 3.) But Plaintiff's allegation that Defendant's sampling results show NAL exceedances is insufficient—by itself—to state a claim based on this particular theory. As mentioned above, the Permit provides that "NAL exceedances . . . are not, in and of themselves, violations." (Permit § I.M.63.) Consequently, Plaintiff must plead facts beyond simply NAL exceedances to state a claim that Defendant has failed to implement adequate BMPs and thus is violating the Permit's principal Effluent Limitation.

Despite Defendant's assertions to the contrary, Plaintiff meets this requirement. In addition to alleging NAL exceedances, Plaintiff pleads specific violations of the minimum BMPs set forth in Permit § X.H.1. Plaintiff describes inadequate implementation of good housekeeping and preventive measures at the facility, including Defendant's failure to cover containers and other industrial materials that are exposed to storm water. (Compl. ¶¶ 66–67.) Likewise, Plaintiff alleges that Defendant has failed to ensure that its staff implements the minimum monitoring and observation requirements pursuant to Permit § X.H.1.g. (*See id.* ¶¶ 84, 130–53; Pre-Suit Notice 6–7.)

Accordingly, Plaintiff plausibly alleges that Defendant is violating the Permit's Effluent Limitations by failing to "implement BMPs that comply with the . . . requirements of [the] Permit to reduce or prevent discharges of pollutants in [its] storm water discharge in a manner that reflects best industry practice . . . ." (*See* Permit § V.A.) The Court therefore denies Defendant's motion to dismiss Plaintiff's second cause of action for failure to state a claim.

---

[9] *Compare* Defendant's reported concentrations of iron (13.3 mg/L), aluminum (8.17 mg/L), and copper (0.231 mg/L), (Pre-Suit Notice 3), *with* the corresponding NAL values (1.0 mg/L, 0.75 mg/L, and 0.0332 mg/L, respectively), (Permit Tbl. 2).

### d. Failure to Comply with Level 1 ERA Requirements

Plaintiff's seventh cause of action goes on to allege that Defendant is out of compliance with its Level 1 ERA status obligations under the Permit's performance measurement system—a *per se* violation of the Permit. (Compl. ¶¶ 156–64.) Plaintiff contends that Defendant's sampling results show NAL exceedances for copper and zinc, but Defendant failed to address these exceedances in its Level 1 ERA plan. (*Id.* ¶¶ 158–60.) Defendant challenges this theory, asserting that the Permit "only requires [it] to sample storm water discharges for TSS [total suspended solids], Oil and Grease, pH, and metals related to its SIC code (5015) – iron (Fe), lead (Pb), and aluminum (Al)." (Mot. 29:21–23.) Stated differently, because Defendant believes it did not have to sample for copper and zinc to begin with, Defendant contends it did not have to address the heightened levels of these pollutants in its storm water discharges under the Permit's ERA performance measurement scheme.

Construing the allegations in the light most favorable to Plaintiff, the Court finds Plaintiff plausibly pleads that Defendant is in violation of the Permit's Level 1 ERA status requirements. Permit § XII describes Defendant's ERA obligations. It provides Defendant must conduct sampling pursuant to § XI.B's sampling provisions and then compare the results of the sampling with the NAL values in Table 2. (*See* Permit § XII.A.) Defendant correctly argues that under § XI.B.6, it is required to sample storm water discharges for "[t]otal suspended solids (TSS) and oil and grease (O&G)," "pH," and "parameters . . . dependent on the facility Standard Industrial Classification (SIC) code." (*See id.* § XI.B.6.a–b, d.) However, § XI.B.6.c also requires Defendant to sample "[a]dditional parameters identified by [Defendant] on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment (Section X.G.2)." (*See id.* § XI.B.6.c.) In turn, § X.G.2 requires that Defendant assess in its pollutant source assessment "[a]t a minimum . . . [t]he pollutants likely to be present in industrial storm water discharges." (*Id.* § X.G.2.a.ii.)

Defendant argues that because it did not identify "copper or zinc as additional parameters" for its facility in its Pollution Prevention Plan pursuant to Permit §§ XI.B.6.c and X.G.2.a.ii., that ends the inquiry. (Mot. 29:24–27.) The Court is unconvinced. Plaintiff alleges Defendant's storm water discharges contain zinc and copper. (Compl. ¶ 48.) These are "common pollutants" that may be present in storm water discharges from industrial facilities. (*See* Permit Fact Sheet § J.3; *see also* Permit Tbl. 2 (listing NAL values for common pollutants).) Further, Plaintiff claims these two pollutants have been "historically found at the Facility." (Pre-Suit Notice 6.) If these two common pollutants have been historically found at the facility, a reasonable interpretation of the Permit is that Defendant should have assessed these constituents in its pollutant source assessment, (*see* Permit § X.G.2.a.ii), and analyzed its storm water samples accordingly, (*see id.* § XI.B.6.c).[10] Simply put, the Permit requires Defendant to analyze, sample, and address exceedances of common pollutants in its storm water discharges that Defendant allegedly is—or plausibly should be—aware of.

Ultimately, Defendant did analyze its storm water discharges for zinc and copper. (*See* Pre-Suit Notice 3.) And, in light of the Permit's terms and Plaintiff's factual allegations summarized above, Plaintiff plausibly pleads that Defendant is required to then compare its sampling data with the NAL values for copper and zinc in Table 2 of the Permit. Further, because a comparison reveals NAL exceedances for these common pollutants in Defendant's storm water discharges, Plaintiff also sufficiently alleges that the Permit requires Defendant to address these exceedances in its Level 1 ERA plan. (*See* Permit § XII.A, C.) Given that the company has purportedly failed to do so, Plaintiff states a cognizable claim that Defendant is in violation of the Permit. (*See id.* § I.M.63 ("A Discharger that does not fully comply

---

[10] The Court also notes that Plaintiff claims Defendant "has failed to acknowledge its scrap metal and recycling activities under SIC code 5093." (Pre-Suit Notice 6.) This SIC code would also require Defendant to sample for zinc under Permit § XI.B.6.d. (*See* Permit Tbl. 1.)

with the Level [ERA] 1 status . . . is in violation of this General Permit.").)
Consequently, the Court denies Defendant's motion to dismiss Plaintiff's seventh
cause of action for failure to state a claim.

### 4. Receiving Water Limitations

Aside from Effluent Limitations, the Permit contains "Receiving Water
Limitations" in § VI, which are based in part on Water Quality Standards. To comply
with these separate limitations, "Dischargers shall ensure that industrial storm water
discharges . . . do not cause or contribute to an exceedance of any applicable water
quality standards in any affected receiving water." (Permit § VI.A.) Further,
"Dischargers shall ensure [their] discharges . . . do not adversely affect human health
or the environment" and "do not contain pollutants in quantities that threaten to cause
pollution or a public nuisance." (*Id.* § VI.B–C.)

Water Quality Standards "[c]onsist[] of beneficial uses, water quality
objectives to protect those uses, an antidegradation policy, and policies for
implementation." (Permit Glossary 8.) These standards "are established in Regional
Water Quality Control Plans (Basin Plans) and statewide Water Quality Control
Plans." (*Id.*) Further, one component of Water Quality Standards—Water Quality
Objectives—are defined "as limits or levels of water quality constituents or
characteristics which are established for the reasonable protection of beneficial uses
of water or the prevention of nuisance within a specific area." (*Id.*)

The "EPA has also adopted water quality criteria (the same as objectives) for
California in the National Toxics Rule and California Toxics Rule." (Permit Glossary
8.) *See also* 40 C.F.R. §§ 131.36, 131.38. The California Toxics Rule sets out a
numeric schedule for toxic pollutants and applies different numeric criteria for the

protection of aquatic life and of human health.[11] *Id.* § 131.38. These criteria "apply concurrently with any criteria adopted by the State, except when State regulations contain criteria which are more stringent for a particular parameter and use." *Id.* § 131.38(c)(1). "If a waterbody has multiple use designations, the criteria must support the most sensitive use." *Id.* § 131.11(a)(1). Moreover, "the criteria apply throughout the water body including at the point of discharge into the water body," unless the State authorizes a "mixing zone . . . or implementation procedures." *Id.* § 131.38(c)(2)(i).

Typically, if a discharger implements BMPs that meet the Technology-Based Effluent Limitations discussed above, the discharger will also satisfy the Permit's requirement that its storm water discharges not cause or contribute to an exceedance of Water Quality Standards. (Permit Factsheet § II.E.) "In addition, however, [the] Permit also makes it clear that, if any individual facility's storm water discharge causes or contributes to an exceedance of a water quality standard, that Discharger must implement additional BMPs or other control measures that are tailored to that facility in order to attain compliance with the receiving water limitation." (*Id.*; *accord* Permit § I.E.37.) Permit § XX.B requires a discharger who determines its storm water discharges "contain pollutants that are in violation of Receiving Water Limitations" to comply with Water Quality Based Corrective Actions, which impose obligations separate from those of Exceedance Response Actions ("ERAs") that the Court considered above.

---

[11] As detailed in the EPA's NPDES Permit Writers' Manual, aquatic life criteria "address both short-term (acute) and long-term (chronic) effects" of pollution and incorporate three separate measurements: (1) magnitude, (2) duration, and (3) frequency. (EPA's NPDES Permit Writers' Manual § 6.1.1.2, Pl.'s RJN Ex. 2.) The magnitude is defined as the "level of pollutant (or pollutant parameter), usually expressed as a concentration, that is allowable." (*Id.*) The duration is "[t]he period (averaging period) over which the in-stream concentration is averaged for comparison with criteria concentrations," and the frequency is "[h]ow often criteria may be exceeded." (*Id.*) In contrast, human health criteria "express the highest concentrations of a pollutant that are not expected to pose significant long-term risk to human health." (*Id.*)

Plaintiff's first claim seeks relief for violation of the Permit's Receiving Water Limitations. (Compl. ¶¶ 102–12.) Defendant moves to dismiss, contending that Plaintiff's claim is based on an impermissible interpretation of the Permit. (Mot. 15:22–21:12.) The Court is unpersuaded. The Permit requires Defendant to "*ensure* that [its] industrial storm water discharges*" do not violate any of the three Receiving Water Limitations. (*See* Permit § VI.A–C (emphasis added).) Thus, the Permit can be reasonably interpreted as providing that if Defendant fails to make certain that its discharges do not violate these limitations, it is violating the Permit.[12] In addition, because the Permit incorporates Receiving Water Limitations based on Water Quality Standards, the Clean Water Act permits a citizen suit to enforce these limitations. *See, e.g.*, *Nw. Envtl. Advocates v. City of Portland*, 56 F.3d 979, 987–90 (9th Cir. 1995).

Plaintiff in turn contends that Defendant has continuously discharged contaminated storm water in violation of the Permit's Receiving Water Limitations since July 24, 2015. (Compl. ¶¶ 102–08; Pre-Suit Notice 3.) To support this claim, Plaintiff alleges Defendant conducts various industrial activities related to its used motor vehicle parts business, including "junk vehicle storage," "battery removal," and "fluid draining." (*Id.* ¶ 45.) Further, "various industrial materials comprised of new and used engine oil, anti-freeze, fuel, batteries, mercury switches, detergents, grease, and solvents are utilized and stored onsite." (*Id.* ¶ 46.) At least some of these materials are stored outside, and Defendant purportedly fails to cover containers at the facility. (*Id.* ¶¶ 66–67.) Thus, Plaintiff claims "particulates from operations, oil,

---

[12] The prior version of the Permit provided that a discharger would "not be in violation" of the Permit's Receiving Water Limitation concerning Water Quality Standards "as long as the [discharger] has implemented BMPs that achieve" the Permit's technology standards and has also complied with certain reporting requirements. (Def.'s RJN Ex. B.) A comparable safe harbor provision is not found in the 2015 Permit's Receiving Water Limitations. (*See* Permit § VI.) Rather, as mentioned, the Permit cautions that a discharger may need to do more than implement BMPs meeting the Permit's Effluent Limitations to satisfy the separate Receiving Water Limitations. (Permit Fact Sheet § II.E.37.)

grease, suspended solids, hazardous waste, phosphorous, and metals such as aluminum, iron, copper, lead and zinc materials are exposed to storm water at the LKQ Facility." (*Id.* ¶ 49.) This polluted storm water is then "discharged from one discharge point at the Facility into the City of Oceanside's storm water conveyance systems or directly to the San Luis Rey River." (*Id.* ¶ 50.)

In addition, Plaintiff asserts Defendant's polluted discharges from its facility "cause, threaten to cause, and/or contribute to the impairment of water quality in the San Luis River." (Compl. ¶ 55.) "Elevated levels of bacteria, chloride, phosphorus, total dissolved solids, nitrogen and toxicity have resulted in the inability of the River to support its beneficial uses." (*Id.*) The San Luis Rey River is therefore impaired for these items. (*Id.* ¶ 75). And, because Defendant's storm water discharges allegedly contain suspended solids, nitrogen, phosphorous, and other pollutants from its industrial activities, Plaintiff asserts Defendant's "polluted discharges cause and/or contribute to the impairment of water quality in the Receiving Waters."[13] (*Id.* ¶¶ 49, 76.) Plaintiff also claims these polluted discharges to the Receiving Waters are

---

[13] A significant portion of the parties' briefing is devoted to disputing whether Water Quality Standards apply to the water quality of Defendant's storm water discharges, as opposed to only the receiving waters. (*See* Mot. 16:12–21:12; Opp'n 15:18–22:19; *see also* Permit § I.E.36; *but see* 40 C.F.R. § 131.38(c)(2)(i).) This issue is relevant because it affects what evidence Plaintiff may rely upon to prove its contention that Defendant's discharges are contributing to exceedances of Water Quality Standards in the receiving waters. For example, if the Water Quality Standards apply directly at the point of discharge from Defendant's facility, Plaintiff may be able to use Defendant's storm water sampling results, which show pollutants in excess of these criteria, to prove this allegation as a matter of law. *See Baykeeper*, 619 F. Supp. 2d at 949–50 (construing prior version of the Permit). Regardless, however, whether Defendant's discharges are contributing to exceedances of Water Quality Standards is ultimately a factual issue. And, given that the Court is considering a motion to dismiss, it must accept as true Plaintiff's allegation that Defendant's polluted discharges are indeed doing so. The Court therefore declines to determine—at this point— what exact evidence Plaintiff will need to introduce to prove this allegation, including potentially sampling results and expert testimony. *See id.* at 947–50 (resolving a similar dispute at the motion for summary judgment phase and concluding the defendant's sampling results supported partial grant of summary judgment in favor of the plaintiff on its claim that the defendant was violating the prior Permit's Receiving Water Limitations).

"harmful to fish, plant, bird life, and human health" and "threaten to cause pollution, contamination, and/or nuisance" to these waters. (*Id.* ¶¶ 104–05.)

Finally, based on Plaintiff's separate claim discussed above, this case is allegedly not one where the discharger has complied with the Permit's Effluent Limitations, which "typically" results in compliance with the Permit's Receiving Water Limitations as well. (*See* Permit Factsheet § II.E.) When combined with Plaintiff's other allegations, Defendant's alleged lack of compliance with the Permit's Effluent Limitations supports—although it does not establish—the conclusion that Defendant is also violating the Permit's Receiving Water Limitations. In other words, Defendant's alleged failure to implement even the Permit's minimum Best Management Practices may explain why its discharges are supposedly contributing to exceedances of Water Quality Standards in the receiving waters.

Overall, when the Court accepts Plaintiff's factual allegations as true and draws all reasonable inferences from them in favor of Plaintiff, the Court concludes Plaintiff plausibly states Defendant is in violation of the Permit's Receiving Water Limitations. That is, Plaintiff pleads sufficient facts to sate a claim that Defendant is failing to "ensure that [its] industrial storm water discharges": (A) "do not cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water"; (B) "do not adversely affect human health or the environment"; or (C) "do not contain pollutants in quantities that threaten to cause pollution or a public nuisance." (*See* Permit § VI.A–C.) The Court therefore denies Defendant's motion to dismiss to dismiss Plaintiff's second claim.

### 5. Pollution Prevention Plan and Corresponding Monitoring & Reporting Program

Beyond complying with the Permit's Effluent Limitations and Receiving Water Limitations, Dischargers are required to develop and implement a site-specific Pollution Prevention Plan. (*See generally* Permit § X.) The requirements for the Plan

include descriptions and assessments of potential pollutant sources, minimum BMPs, any applicable advanced BMPs, and a Monitoring & Reporting Program. (*Id.* § X.A.) As indicated above, the Permit's Monitoring & Reporting Program requirement involves (i) monthly visual observations and (ii) storm water sampling and analysis of QSEs. (*Id.* § XI.A–B.) Further, within thirty days of obtaining sampling results, dischargers must upload them to the State Water Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") website. (*Id.* § XI.B.11.a.) To remain in compliance with the Permit, dischargers must also "electronically self-report any violations via SMARTS." (*Id.* § I.J.56.)

### a. Inadequate Pollution Prevention Plan

Plaintiff's third cause of action charges that Defendant has failed to implement an adequate Pollution Prevention Plan. (Compl. ¶¶ 122–29.) Defendant argues Plaintiff's claim should be dismissed because it "consists of nothing but a conclusory label" that Defendant has failed to implement an adequate Plan under Permit § X. (Mot. 25:7–8.)

The Court disagrees. Plaintiff has furnished "enough facts to state a claim to relief that is plausible on its face." *See Twombly*, 550 U.S. at 570. Plaintiff alleges numerous specific deficiencies in Defendant's Plan, both in terms of its development and its implementation. Citing Permit § X.E's Pollution Prevention Plan map requirements, Plaintiff alleges that Defendant's map of its facility "fails to include the discharge and sampling locations, identify San Luis Rey as the 'nearby water body' and adjacent receiving water, and identify locations where materials are exposed to precipitation, areas of industrial activity subject to the Permit, including storage areas, shipping and receiving areas, vehicle and equipment storage and maintenance areas, or material handling and processing areas." (Pre-Suit Notice 6; *see also* Compl. ¶ 2.) Additionally, Plaintiff alleges that Defendant failed to adequately account for "its scrap metal and recycling activities under SIC code 5093"

in the Plan. (Pre-Suit Notice 6.) Likewise, given Defendant's sampling results and Plaintiff's other claims, Plaintiff plausibly alleges that the Permit requires Defendant to revise its Pollution Prevention Plan, but Defendant has failed to do so. (*See id.* (alleging Defendant's Plan has not been updated to address the purported "numerous and egregious water quality violations"); *see also* Permit § X.B.1 ("The Discharger shall . . . [r]evise their on-site SWPPP whenever necessary[.]").) Hence, the Court denies Defendant's motion to dismiss Plaintiff's third cause of action for failure to state a claim.

### b. Failure to Implement an Adequate Monitoring & Reporting Program

Plaintiff's fourth cause of action alleges that Defendant has not implemented an adequate Monitoring & Reporting Program. (Compl. ¶¶ 130–39.) Defendant challenges this claim, arguing it should "be dismissed for incorrectly alleging [Defendant] is required to sample for phosphorous." (Mot. 25:14–16; *see also id.* 28:21–29:9.)

The Court rejects this challenge for two reasons. First, the argument does not address the other allegations supporting Plaintiff's fourth cause of action. Thus, even if Defendant's challenge had merit, the Court would not grant Defendant's request to dismiss Plaintiff's fourth claim. Second, the Court finds Defendant's partial challenge lacks merit. As mentioned above, Defendant must sample "[a]dditional parameters identified by [Defendant] on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment (Section X.G.2)." (*See* Permit § XI.B.6.c.) Defendant's pollutant source assessment must include "the industrial pollutants related to the receiving waters with [CWA §] 303(d) listed impairments identified in Appendix 3" of the Permit. (*See id.* § X.G.2.a.ix.)

Appendix 3 identifies the San Luis Rey River as impaired for phosphorous. (Permit App'x 3.) Further, the Court accepts as true Plaintiff's assertions that phosphorus is an industrial pollutant associated with Defendant's activities. (Compl. ¶¶ 48, 55, 65, 96.) Accordingly, Defendant's assessment of potential pollutant sources should have also identified phosphorus as an "industrial pollutant[] related to the receiving waters with [CWA §] 303(d) listed impairments," (*see* Permit § X.G.2.a.ix), triggering Defendant's corresponding obligation to sample for this pollutant, (*see id.* § XI.B.6.c). Thus, Plaintiff plausibly pleads that the Permit requires Defendant to address phosphorous in its Monitoring & Reporting Program, but that it has failed to do so. The Court therefore denies Defendant's request to dismiss Plaintiff's fourth cause of action.

## IV.    **CONCLUSION**

In light of the foregoing, dismissing this action under Rule 12(b)(1) and (b)(6) is not appropriate. Defendant attacks the sufficiency of Plaintiff's Pre-Suit Notice under the Clean Water Act, but because the notice: (i) made clear with whom Defendant needed to conduct negotiations, and (ii) included sufficient information to permit Defendant to identify the alleged violations and bring itself into compliance, the Court finds that Plaintiff's Pre-Suit Notice was adequate. Hence, the Clean Water Act confers jurisdiction over this citizen suit. The Court is also unpersuaded by Defendant's argument that it has mooted several of Plaintiff's causes of action in their entirety.

Furthermore, Plaintiff states cognizable claims for violations of the Clean Water Act. Plaintiff plausibly alleges that Defendant is failing to: (1) implement adequate Best Management Practices to comply with the Permit's Effluent Limitations; (2) adhere to the requirements of the Permit's performance measurement system that involves Exceedance Response Actions; (3) ensure that the company's storm water discharges do not violate the Permit's Receiving Water Limitations; (4)

revise and execute its Storm Water Pollution Plan as required by the Permit; and (5) implement an adequate Monitoring & Reporting Program. Accordingly, the Court **DENIES** Defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim (ECF No. 7).

      **IT IS SO ORDERED.**

**DATED: December 8, 2017**

Hon. Cynthia Bashant
United States District Judge

17cv0425